<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1   Meathead Restaurants, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Northern District of Illinois**

Case number:  21-04731
</td>
<td>

**FILED**

U.S. Bankruptcy Court
Northern District of Illinois

6/28/2021

Jeffrey P. Allsteadt, Clerk
</td></tr>
</table>

## Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | C150–II 709 S Main LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor        The Flats at Normal |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>C150–II 709 S Main LLC<br>Name<br><br>c/o Lauren Sawyer<br>110 Wild Basin Road, Ste 365<br>Austin, TX 78746<br><br>Contact phone      512–472–6222<br><br>Contact email<br>lswawyer@campusadv.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): | **Where should payments to the creditor be sent? (if different)**<br><br>Name<br><br><br>Contact phone<br><br>Contact email |
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known)          Filed on ___<br><br>MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

Official Form 410                              Proof of Claim                              page 1



EXHIBIT

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

| 6.Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
|---|---|

| 7.How much is the claim? | $ _____18680.12_____ | **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

**8.What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Past due rent and lease obligations − see Addendum attached.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410−A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $ _____

**Amount of the claim that is secured:**  $ _____

**Amount of the claim that is unsecured:**  $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed
☐ Variable

| 10.Is this claim based on a lease? | ☐ No<br>☑ Yes. **Amount necessary to cure any default as of the date of the petition.** | $ _____18680.12_____ |
|---|---|---|

| 11.Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |
| | * Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    6/28/2021
                    MM / DD / YYYY

/s/  Michael Orsak

Signature

Print the name of the person who is completing and signing this claim:

Name    Michael Orsak
        First name    Middle name    Last name

Title    Authorized Representative

Company    C150-II 709 S Main LLC c/o Campus Advantage Inc.
           Identify the corporate servicer as the company if the authorized agent is a servicer

Address    110 Wild Basin Road Ste 365
           Number    Street
           Austin, TX 78746
           City    State    ZIP Code

Contact phone    512-472-6222    Email    lsawyer@campusadv.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Crave Brands, LLC, *et al.*,[1] | Case No. 21-04729 |
| Debtors. | Judge Timothy A. Barnes |
| | (Jointly Administered) |

### ADDENDUM TO PROOF OF CLAIM

1.       Meatheads Restaurants, LLC, (the "***Debtor***") leases retail space located at 709 S. Main St., Normal, IL 61761 (the "***Premises***") from C150-II 709 S Main LLC (the "***Claimant***") pursuant to a written lease.[2]

2.       The written lease was originally dated October 29, 2010 and entered into by Meatheads Normal, LLC as tenant and Normal Main, L.L.C. as landlord (the "***Original Lease***"). On February 1, 2019, the Original Lease was amended (the "***First Amended Lease***") after the Claimant acquired the Premises from Normal Main, L.L.C. to allow, among other provisions, a period of reduced Base Rent through December 31, 2019 and a requirement to pay Percentage Rent.  On June 12, 2020, Meathead Restaurants, LLC and the Claimant entered into the Second Amendment to Lease Agreement (the "***Second Amended Lease***," and together with the Original Lease and First Amended Lease, the "***Lease Agreement***").  The Second Amended Lease provided for an Additional Rent Reduction Period through March 31, 2021, but also required that if any default under the Lease Agreement occurred during the Additional Rent Reduction Period the

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Crave Brands, LLC (1026) and Meatheads Restaurants, LLC (5094).  The Debtors' service address is 444 W. Lake Street 17th Floor, Chicago, IL 60606.

[2]       Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Lease Agreement.

"Additional Rent Reduction Period shall immediately terminate and [the Debtor] shall commence payment of the full Base Rent and Pass-Through Rent provided for under the Lease without reduction."

3.      A true and correct copy of the Lease Agreement is attached as **Exhibit A** of this Addendum. In general, the Lease Agreement provides that the Debtor's monthly rental payments under the Lease Agreement are payable "on or before the first day of every month" in the amount of $7,195.83.[3] Additionally, the Lease Agreement requires that the Debtor pay Monthly Estimated Pass-Through Rent for the maintenance of common areas as well as property tax and insurance.[4]

4.      Following execution of the Lease Agreement, an event of default occurred under the Lease Agreement after the Debtor failed to timely pay rent owed for March and April.[5] This event of default triggered the termination of the Additional Rent Reduction Period under the Second Amended Lease and required that the Debtor pay full Base Rent and Pass-Through Rent, which includes payments for insurance, property tax, and common area maintenance.

5.      As of the Petition Date and after giving credit to all amounts received from the Debtor and applicable abatement provisions under the Lease Agreement, the Claimant holds an unsecured claim against the Debtor in an amount of $18,680.12. This amount does not include postpetition rent due under the Lease Agreement. A statement of account reflecting the amounts due and owing under the Lease Agreement is attached as **Exhibit B**.

6.      The Claimant reserves its right to amend and/or supplement this Proof of Claim if required for any reason including, but not limited to liquidating amounts owed for additional rent under the Lease Agreement for which the Claimant has not yet billed. The Claimant further

---

[3]    *See* Second Amended Lease at Section 1.

[4]    *See* Original Lease at Sections 4.1 and 5.1.

[5]    *See* Original Lease at Section 15.1(a).

US 8090790

reserves its right to file a request for payment of an administrative expense to which it may be entitled.

7.      The filing of the Proof of Claim and Addendum shall not constitute: (i) a waiver or release of the Claimant's rights against the Debtor, or any other person or property, (ii) a waiver of the Claimant's right to seek to have the reference withdrawn with respect to the subject matter of these claims, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in the Debtor's bankruptcy against or otherwise involving the Claimant, or (iii) an election of remedies or choice of law.  The Claimant hereby expressly preserves any and all rights, claims, causes of action, defenses, counterclaims or objections, or any similar rights, remedies, or defenses against any and all persons or entities, whether in this Bankruptcy Court or elsewhere, whether currently existing or arising in the future, against whom it determines it has claims.

8.      All Notices regarding this proof of claim and addendum shall be directed to:

> Lauren Sawyer
> Campus Advantage Inc.
> 110 Wild Basin Rd.
> Suite 365
> Austin, TX 78746

with a copy to:

> Harold J. Taylor
> Vinson & Elkins LLP
> 2801 Via Fortuna
> Suite 100
> Austin, TX 78746.

US 8090790

## EXHIBIT E

### DELIVERY OF POSSESSION

Store:  701 South Main Street, Normal, Illinois

| | |
|---|---|
| Tenant: | Meathead Normal, LLC |
| Landlord: | Normal Main, LLC |
| Premises Address: | 701 South Main Street, Normal, Illinois |
| Square Footage: | 2,635 |

Landlord and Tenant acknowledge and agree to the following:

Floor Area is 2,635 square feet

Prorata Share is 34.79%

Turnover Date is July 1, 2011

Rent Commencement Date is August 22, 2011

Expiration Date is August 31, 2021

Renewal Option #1 needs to be exercised by March 4, 2021

Renewal Option #2 needs to be exercised by March 26, 2026

Choose one:

- Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

- Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

Tenant hereby identifies the items of Landlord's Work indicated below are not complete:

_____

_____ [Attach additional pages if needed]

*     *     *     *     *

[Signature Page Follows]

Normal Main, LLC & Meat Heads Lease                E-1

LANDLORD:

NORMAL MAIN, LLC,
an Illinois limited liability company

By: _____
Its Authorized Signatory

Date: 9/7/2011

TENANT:

MEATHEAD NORMAL, LLC,
an Illinois limited liability company

By:  Meathead Management, LLC, its
member

By:  Jed Reich Investments, LLC, its
Manager

By: _____
Tom Jednorowicz, its Manager

Date: 9·12·11

E-2



**Meatheads**

**Store Lease**

### MEATHEADS
### STORE LEASE REFERENCE PAGE

PROJECT:

The Flats on Main

Main & Osage Mixed Use Development

LANDLORD:

Normal Main, L.L.C.,
an Illinois limited liability company

LANDLORD'S ADDRESS:

30 West Monroe Street, #1000
Chicago, Illinois 60603

TENANT:

Meatheads Normal, LLC,
an Illinois limited liability company

TENANT'S ADDRESS:

BROKER:

Tartan Realty Group, Inc.

EFFECTIVE DATE:

October 29, 2010

PREMISES:

Approximately 2,622 square feet of Floor
Area on the first floor of the Project, as
depicted on Exhibit B, attached hereto and
incorporated herein by reference.

INITIAL TERM OF LEASE:

Ten years.  See Article 2.

EXTENSION TERM:

Two (2) consecutive five (5) year options.

TURNOVER DATE:

See Article 2.

SCHEDULED TURNOVER DATE:

July 1, 2011

| | |
|---|---|
| RENT COMMENCEMENT DATE: | See Article 2. |
| EXPIRATION DATE: | The last full day of the Term. |
| MONTHLY INSTALLMENT(S) OF RENT: | $29.79 per square foot of Floor Area for the first Lease Year, and thereafter as provided in Article 3. |
| ESTIMATED PASS-THROUGH RENT: | $6.60 per square foot of Floor Area for the first calendar year, and thereafter as provided in Article 4. |
| LANDLORD'S WORK: | See Section 6.2 and Exhibit D. |
| TENANT'S PRO RATA SHARE: | 34.79%.  See Section 4.5. |

   *The information on this Reference Page is incorporated into and made a part of the Lease.  In the event of any conflict between any Reference Page information and the Lease, the Lease shall control.  This includes all Exhibits attached to and incorporated into the Lease.*

LANDLORD:                                      TENANT:

NORMAL MAIN, LLC,                    MEATHEAD NORMAL, LLC,
an Illinois limited liability company    an Illinois limited liability company

By: _____       By: _____
Its Authorized Signatory                  Its Authorized Signatory

TABLE OF CONTENTS

Page

1.  PREMISES .................................................................................................................1
2.  TERM .........................................................................................................................1
    2.1  Effective Date..............................................................................................1
    2.2  Delivery of Possession ...............................................................................1
    2.3  Term............................................................................................................2
    2.4  Delay in Delivery of Possession .................................................................2
    2.5  Lease Year..................................................................................................3
    2.6  Extension.....................................................................................................3
    2.7  Holding Over ...............................................................................................4
3.  BASE RENT ...............................................................................................................4
4.  PASS-THROUGH RENT ............................................................................................5
    4.1  Tenant's Payment .......................................................................................5
    4.2  Reconciliation..............................................................................................5
    4.3  Records.......................................................................................................6
    4.4  Dispute Resolution .....................................................................................6
    4.5  Tenant's Pro Rata Share ............................................................................6
    4.6  Tenant's Cap on Operating Expenses.........................................................7
5.  REAL ESTATE TAXES ...............................................................................................7
    5.1  Tenant's Obligation .....................................................................................7
    5.2  Landlord's Obligation...................................................................................8
6.  CONDITION OF THE PREMISES, POSSESSION.......................................................8
    6.1  Condition of the Premises ...........................................................................8
    6.2  Landlord's Obligation...................................................................................9
    6.3  Tenant Allowance ........................................................................................9
    6.3  Floor Area..................................................................................................10
7.  USE............................................................................................................................10
    7.1  Use.............................................................................................................10
    7.2  Compliance with Law ................................................................................10
    7.3  Exclusivity..................................................................................................11
    7.4  Restrictions on Use ...................................................................................11

8.  MAINTENANCE, REPAIRS AND ALTERATIONS ......................................................11
    8.1  Tenant's Obligations..................................................................................11
    8.2  Landlord's Obligations................................................................................12
    8.3  Surrender ..................................................................................................13
    8.4  Landlord's Access .....................................................................................13
    8.5  Alterations and Additions...........................................................................13

Page

8.6  Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings ................................................................14
8.7  Interruption of Services................................................................15
9.    INSURANCE; INDEMNITY                                                    15
9.1  Tenant's Insurance................................................................15
9.2  Landlord's Insurance................................................................16
9.3  Waiver of Claims and Subrogation ..........................................17
9.4  Indemnification by Tenant ......................................................17
9.5  Indemnification by Landlord....................................................17
10.   HAZARDOUS SUBSTANCES ....................................................17
10.1 Tenant's Covenants ................................................................17
10.2 Landlord's Covenants................................................................18
10.3 Hazardous Substance Indemnity............................................18
11.   DAMAGE OR DESTRUCTION ..................................................18
11.1 Material Damage ....................................................................18
11.2 Repair After Damage................................................................19
11.3 Uninsured Damage ................................................................19
11.4 Damages During Final Two Years............................................19
11.5 Abatement of Rent ................................................................19
11.6 Termination ............................................................................20
12.   CONDEMNATION........................................................................20
12.1 Condemnation of Premises ....................................................20
12.2 Condemnation of the Property – Premises Not Suitable ..........20
12.3 Condemnation of the Property – Shopping Center Not Suitable .............20
12.4 Restoration ............................................................................20
12.5 Abatement of Rent ................................................................21
12.6 Award ....................................................................................21
12.7 Termination ............................................................................21
13.   UTILITIES ................................................................................21
14.   ASSIGNMENT AND SUBLETTING ..........................................21
15.   DEFAULTS; REMEDIES ............................................................22
15.1 Tenant Default........................................................................22
15.2 Remedies for Tenant Default....................................................23
15.3 Landlord Default ....................................................................24
15.4 Remedies for Landlord Default................................................25
16.   SIGNAGE..................................................................................25
17.   OUTDOOR SEATING ................................................................26
17.   PARKING AND ACCESS............................................................26
19.   TRASH REMOVAL AND GREASE TRAP ....................................27

| | | Page |
|---|---|---|
| 19.1 | Trash Removal | 27 |
| 19.2 | Grease Trap | 28 |
| **20.** | **REPRESENTATIONS AND WARRANTIES** | 28 |
| 20.1 | Tenant Representations | 28 |
| 20.2 | Landlord Representations | 29 |
| **21.** | **QUIET ENJOYMENT** | 29 |
| **22.** | **NOTICES** | 30 |
| **23.** | **BROKERS** | 31 |
| 23.1 | Tenant | 31 |
| 23.2 | Landlord | 31 |
| **24.** | **SUBORDINATION; ESTOPPEL** | 31 |
| 24.1 | Subordination, Nondisturbance and Attornment | 31 |
| 24.2 | Estoppel Certificate | 31 |
| **25.** | **GENERAL PROVISIONS** | 32 |
| 25.1 | Landlord Assignment | 32 |
| 25.2 | Severability | 32 |
| 25.3 | Headings | 32 |
| 25.4 | Incorporation of Prior Agreements; Amendments | 32 |
| 25.5 | Waivers | 33 |
| 25.6 | Cumulative Remedies | 33 |
| 25.7 | Binding Effect, Choice of Law | 33 |
| 25.8 | Only Landlord/Tenant Relationship | 33 |
| 25.9 | Attorneys' Fees | 33 |
| 25.10 | Force Majeure | 33 |
| 25.11 | Confidential Lease Information | 34 |
| 25.12 | Confidential Tenant Information; Financial Statements | 34 |
| 25.13 | Limitation on Landlord's Liability | 34 |
| **26.** | **SALE TAX** | 307 |
| **27.** | **PREVAILING WAGES** | 307 |
| **28.** | **LEED COMPLIANCE** | 307 |
| | **SIGNATURE PAGE** | 36 |

EXHIBIT A – LEGAL DESCRIPTION

EXHIBIT B – SITE PLAN

EXHIBIT C – CERTAIN DEFINITIONS

EXHIBIT D – LANDLORD'S WORK

Page

EXHIBIT E – DELIVERY OF POSSESSION

EXHIBIT F – SIGNAGE, PRELIMINARY PLANS, PRE-OPENING SIGNAGE,
    TRADE DRESS AND EXTERIOR ELEVATION

EXHIBIT G – RESTRICTIONS ON USE

## MEAT HEADS NORMAL
## MEAT HEAD STORE LEASE

The Reference Page, including all terms defined thereon, is hereby incorporated as part of the Lease.

1.     PREMISES.

Landlord is the owner of the building and improvements, (if any) (the "Project") that are now or hereinafter situated upon the real property legally described in Exhibit A attached hereto (the "Property"). In consideration of the mutual promises, agreements and conditions herein set forth, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises. Certain initially capitalized terms used the Lease are defined on the Reference Page and in Exhibit C attached hereto. Landlord and Tenant acknowledge and agree that the Property consists of the retail portion of the Property ("the Retail Portion of the Property") shown on Exhibit B and the residential portion of the Property ("the Residential Portion of the Property") shown on Exhibit B and that except as otherwise provided in this Lease, Tenant shall have no right to use any portion of the Residential Portion of the Property nor be required to pay or perform any obligations in the connection with the Residential Portion of the Property. Tenant shall have the nonexclusive right, in common with Landlord, other tenants and occupants of the Project and other to whom rights to use same are now are hereafter granted, to use any and all appurtenances and easements benefiting the Premises and the Project, along with sufficient Common Areas, subject to covenants, conditions, restrictions, and encumbrances of record.

2.     TERM.

2.1     Effective Date. This Lease and the parties' obligations hereunder shall be effective as of the Effective Date.

2.2     Delivery of Possession. Tenant shall not be deemed to have accepted possession of the Premises, and the "Turnover Date" shall not be deemed to have occurred, until each of the following conditions has been satisfied:  (a) Landlord has substantially completed Landlord's Work (b) Tenant's Plans (as defined herein) for the Initial Improvements (as defined herein) and Tenant's trade name, logo sign, pre-opening signage, and trade dress, a facsimile of which is attached to the Lease as Exhibit F have been approved by Landlord; and (c) Landlord has delivered a fully executed copy of the Lease to Tenant. Landlord shall deliver the Premises no earlier than thirty (30) days after Landlord notifies Tenant in writing of the anticipated date of delivery which may occur prior to the Scheduled Turnover Date.

In addition to the foregoing, the "Turnover Date" shall be conditioned upon Tenant obtaining on or before May 1, 2011 ("Permit Deadline"), at Tenant's sole cost

and expense, all permits necessary for the construction of the Initial Improvements ("Permit Condition"). Tenant shall promptly, following Landlord's approval of Tenant Plans, apply for all such permits, and Tenant shall thereafter pursue the issuance of such permits with due diligence. Landlord shall cooperate with Tenant in connection with obtaining such permits at no out-of-pocket cost, and without further liability, to Landlord. In the event Tenant is not able to obtain all such permits prior to the Permit Deadline, despite using diligent, commercially reasonable efforts to obtain same, Tenant shall have the right to terminate this Lease by giving written notice of such termination to Landlord prior to the expiration of the Permit Deadline. If Tenant fails to provide notice of termination prior to the expiration of the Permit Deadline, Tenant shall be deemed to have waived the Permit Condition and the Turnover Date shall in no event be further delayed as a result of any failure to obtain permits for the Initial Improvements. If Tenant provides such termination notice on or before the Permit Deadline, Landlord shall have the right, but not the obligation, upon notice to Tenant to attempt to obtain such permits. If Landlord elects to exercise its right to cure hereunder and fails to obtain such permits within ninety (90) days following the Permit Deadline, then this Lease shall terminate automatically upon the expiration of such ninety (90) day period without further action of the parties. If Landlord does not exercise its right to cure hereunder within ten (10) days after the Permit Deadline, then this Lease shall terminate automatically upon the expiration of such ten (10) day period without further action of the parties. If Landlord elects to exercise its right to cure hereunder following Tenant's notice of termination hereunder, the Turnover Date shall remain conditioned upon the issuance of such permits. Tenant shall cooperate with Landlord in connection with the exercise of Landlord's cure rights hereunder.

2.3     Term.  The Initial Term of the Lease shall be the period of ten years beginning on the Rent Commencement Date plus, if the last day of such period is not the last day of a calendar month, the number of days as would extend such period through the last day of a calendar month, unless sooner terminated or extended as provided herein. As used herein, (a) "Rent Commencement Date" means the date that is the earlier of (i) ninety (90) days after the Turnover Date, or (ii) the date that Tenant opens for business to the public at the Premises, and (b) "Term" means the Initial Term and any properly exercised Extension Term.

2.4     Delays in Delivery of Possession.  Subject to the provisions hereof, Tenant is entitled to possession of the Premises on the Scheduled Turnover Date. Landlord acknowledges that Tenant intends to start construction of Tenant's improvements on the Scheduled Turnover Date and that a delay in delivery of the Premises beyond such date will cause Tenant to suffer certain losses which are difficult to quantify including, by way of illustration and not of limitation, lost profits, construction delay costs and employee wages. If the Turnover Date does not occur on or before the Scheduled Turnover Date and such failure is because (a) the Premises is not vacant; (b) Landlord has not completed work to be done by Landlord to bring the Premises into the condition required by the Lease (provided that Landlord's failure to complete such work is not caused in whole or in part by Tenant Delay defined in Exhibit C); or (c) any reason within the reasonable control of Landlord, its agents or contractors, then the Rent Commencement Date shall be postponed beyond the date it would otherwise

occur by one (1) day for each day of such delay. Except for delays caused by Tenant, if the Turnover Date does not occur on or before October 1, 2011, Tenant, at its option, to be exercised on or before the earlier of (i) November 1, 2011, and (ii) the day immediately preceding the actual delivery of the Premises by Landlord, Tenant shall have the right to terminate this Lease upon written notice to Landlord. If Tenant elects to terminate this Lease as provided in the preceding sentence, and the Turnover Date is delayed because of a reason described in subparagraphs (a), (b) or (c) of this paragraph (other than as a result of Tenant Delay), then Landlord shall reimburse Tenant for all of Tenant's out-of-pocket expenses incurred in connection with the Lease, including, without limitation, site selection, preparation of plans, specifications, renderings and elevations, and lease negotiation costs and expenses (including the allocated cost of in-house personnel), not to exceed $25,000. The foregoing shall be in addition to any other right or remedy available to Tenant. Landlord shall also promptly return all monies previously deposited by Tenant, if any. In no event shall Landlord be liable to Tenant for any consequential or special damages.

If the Turnover Date does not occur on or before the Scheduled Turnover Date and such failure is because of a Tenant Delay, (i) the Rent Commencement Date shall be shortened by one (1) day for each day of such delay and (ii) the Scheduled Turnover Date shall be extended by one (1) day for each day of such delay.

2.5    Lease Year. For the purpose of the Lease, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12) consecutive calendar months during the Term, provided that if the Term commences on other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding 12 full calendar months shall constitute the first Lease Year of the Term.

2.6    Extension. So long as no Tenant Default exists at the time of exercise, Tenant shall have the option to extend the Term for two (2) consecutive five (5) year periods (each an "Extension Term"), upon the same terms and conditions as contained in the Lease. All of the terms and conditions of the Lease shall apply during an Extension Term, except that Base Rent for each Extension Term shall be as set forth in Article 3 below and Landlord shall have no obligation with respect to Landlord's Work or to otherwise improve the Premises. Extension options will exercise automatically unless Tenant shall give Landlord written notice at least one hundred eighty (180) days prior to the then applicable Expiration Date ("Tenant's Extension Notice") of its intent to not exercise an extension. The expiration of Tenant's Extension Notice shall be effective to extend the Term-without further documentation except that at any time after Tenant has exercised its option to extend the Lease, Landlord and Tenant, upon request of either, will sign and acknowledge a written memorandum evidencing Tenant's exercise of the option and stating the date to which such Extension Term will extend and the rental rates that will be applicable during such Extension Term. Either party's failure to execute and deliver such a memorandum shall not, of itself, vitiate the parties' respective obligations concerning the Extension Term.

2.7    Holding Over.  If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of the Term, without the express written consent of Landlord, then at Landlord's sole option, such occupancy shall be a tenancy from month-to-month upon the terms and conditions of the Lease, except that Base Rent shall be payable at rate equal to one hundred fifty percent (150%) of the Base Rent payable in the last month of the Term.

3.    BASE RENT.

Tenant shall pay to Landlord Base Rent in the amounts hereinafter set forth commencing on the Rent Commencement Date and on or before the first day of every month thereafter during the Term.  Base Rent for any partial calendar month shall be prorated on a daily basis based on a 365 day year.

Base Rent during the Term shall be as follows:

Initial Term

| Lease Year | $ Per Square Foot | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 1 – 5 | $29.79 | $78,500.00 | $6,541.67 |
| 6 -10 | $32.77 | $86,350.00 | $7,195.83 |

Extension Term 1

| Lease Year | $ Per Square Foot | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 11 – 15 | $36.05 | $94,985.00 | $7,915.42 |

Extension Term 2

| Lease Year | $ Per Square Foot | Annual Base Rent | Monthly Installment |
|---|---|---|---|
| 16 – 20 | $39.65 | $104,483.50 | $8,706.96 |

Base Rent, Pass-Through Rent and all other amounts becoming due from Tenant to Landlord hereunder shall be paid in lawful money of the United States to Landlord at the address set forth on the Reference Page, or at such other address as Landlord shall designate in writing to Tenant from time to time, without any setoff or abatement whatsoever.

In the event an installment of Base Rent or Pass-Through Rent is not paid to Landlord on or before the tenth (10th) day of the month, Tenant shall pay, on demand as Additional Rent, a service charge equal to ten percent (10%) of the past due sum.

4.    PASS-THROUGH RENT.

4.1    Tenant's Payment.    Tenant shall pay Pass-Through Rent to Landlord as provided in this Article as additional rent due under the Lease.  At least thirty (30) days prior to the Rent Commencement Date and at least thirty (30) days prior to the beginning of each calendar year thereafter, Landlord shall deliver to Tenant a written statement ("Landlord's Estimate Statement") setting forth the following for the forthcoming calendar year (or balance thereof):  (a) Landlord's estimates (itemized in reasonable detail) for the total amount of Operating Expenses, Real Estate Taxes and Landlord's Insurance Expenses; (b) Landlord's estimate of the annual amount of Pass-Through Rent; and (c) a calculation of 1/12 of Landlord's estimate of Pass-Through Rent ("Monthly Estimated Pass-Through Rent").

Commencing as of the Rent Commencement Date and on the first day of each calendar month thereafter during the Term, Tenant shall pay to Landlord the Monthly Estimated Pass-Through Rent based upon the most recent Landlord's Estimate Statement in connection with (i) maintaining, repairing, replacing, managing, operating and insuring the Common Areas of the Retail Portion of the Project and (ii) trash removal, insurance and snow and ice removal expenses on the common areas of the Residential Portion of the Property (the "Residential Expenses").  Pass-Through Rent for any partial calendar month shall be prorated on a daily basis based on a 365 day year.  Notwithstanding anything contained herein to the contrary, Tenant's Monthly Estimated Pass-Through Rent for the first calendar year of the Lease shall be based on the amount set forth in Store Lease Reference Page of this Lease and shall not be adjusted until after the expiration of the first calendar year.

4.2    Reconciliation.    Landlord shall deliver to Tenant within one hundred twenty (120) days after the end of each calendar year during the Term a statement ("Landlord's Annual Statement"), itemized in reasonable detail and including supportive documentation, setting forth: (a) the actual amount of Operating Expenses, Real Estate Taxes and Landlord's Insurance for the prior calendar year; (b) the amount of Tenant's Pass-Through Rent based upon the actual amount of Operating Expenses, Real Estate Taxes and Landlord's Insurance for the prior calendar year; and (c) the total amount of Monthly Estimated Pass-Through Rent payments made by Tenant during the prior calendar year.  If the amount of Tenant's Pass-Through Rent actually due exceeds the amount of Monthly Estimated Pass-Through Rent paid by Tenant for the prior calendar year, Tenant shall pay the deficiency to Landlord within thirty (30) days after Tenant's receipt of Landlord's Annual Statement.  If the amount of Monthly Estimated Pass-Through Rent paid by Tenant exceeds the amount of Tenant's Pass-Through Rent actually due for the prior calendar year, Landlord shall pay the excess to Tenant within thirty (30) days after Tenant's receipt of Landlord's Annual Statement, or at Landlord's option (except for the last Lease Year), apply such excess to Tenant's Pass-Through Rent and/or Base Rent next due.

4.3   Records.   Landlord shall maintain books and records showing all expenditures incurred as Operating Expenses, Landlord's Insurance and Real Estate Taxes in accordance with generally accepted accounting principles as applied to building management. Landlord shall keep such books and records for each calendar year (or portion thereof) falling within the Term for a period of three (3) years following each such calendar year.  Upon at least twenty (20) days' prior written notice to be exercised by Tenant (if at all) not more than once during any Lease Year, all such books and such records shall be made available for inspection by Tenant and/or its agents during ordinary business hours at Landlord's offices; provided, that, (i) Tenant shall not be permitted to audit any calendar year more than once and (ii) Tenant shall be permitted to audit only those records pertaining to the three (3) calendar years immediately preceding such audit.

4.4   Dispute Resolution.  Landlord and Tenant shall attempt to resolve in good faith any dispute with respect to Pass-Through Rent.  If, despite their good faith efforts, Landlord and Tenant are unable to so resolve any such dispute within sixty (60) days after the initial notice of dispute by one party to the other, then either party may request an audit of the disputed matter from a nationally recognized firm of independent certified public accountants, whose decision shall be based on generally accepted accounting principles consistently applied and shall be final and binding on the parties.  If there is a variance of three percent (3%) or more between said decision and the Landlord's final determination of Tenant's Pass-Through Rent, which determination resulted in an overpayment by Tenant, Landlord shall pay the reasonable costs of said audit, and shall pay Tenant the amount of any overpayment within thirty (30) days after such determination.  If such decision shows that Tenant has underpaid Landlord, then Tenant shall pay to Landlord the amount of such shortfall within thirty (30) days after such determination.  In all other cases, the party requesting the audit shall pay the cost of said audit.

4.5   Tenant's Pro Rata Share.  "Tenant's Pro Rata Share" for purposes of determining Tenant's Pass-Through Rent for Operating Expenses, Real Estate Taxes and Landlord's Insurance Expenses means the ratio of the Floor Area of the Premises (2,622 square feet) to the total leaseable Floor Area of the Project (7,444 square feet). The Retail Portion of the Property consists of one (1) building containing a total rentable area of approximately 7,444 square feet.  "Tenant's Proportionate Share" with respect to Residential Expenses may be expressed as a fraction the numerator of which is the rentable area of the Premises and the denominator of which is the rentable area of the aggregate of Retail Portion of the Property and the Residential Portion of the Property, whether occupied or not. The Retail Portion of the Property consists of one (1) building containing a total rentable area of approximately 7,573 square feet.   "Tenant's Proportionate Share" with respect to Residential Expenses may be expressed as a fraction the numerator of which is the rentable area of the Premises and the denominator of which is the rentable area of the aggregate of Retail Portion of the Property plus the Residential Portion of the Property, whether leased, occupied or not. The Residential Portion of the Property consists of one (1) building containing a total rentable area of approximately 41,520 square feet.  If the number of square feet of rentable floor area of the Retail Portion of the Property changes during the Term, then

Tenant's Proportionate Share shall be adjusted accordingly. Subject to the terms of this Lease, Tenant acknowledges and agrees that Landlord shall have the right to construct an additional residential building in the area shown on the Site Plan as "Future Residential Area." Landlord reserves the right at any time, and from time to time, to have the area of each floor, area or space within the Retail Portion of the Property measured by a neutral third party licensed architect at Landlord's sole cost; and subject to the terms of this Section 10.12, in the event such measurement shows any variation in the rentable floor area of the Retail Portion of the Property, then Tenant's Proportionate Share shall be adjusted accordingly.

4.6    Tenant's Cap on Operating Expenses. Tenant's actual Pass-Through Rent for Operating Expenses shall not increase from one calendar year to the next calendar year by more than seven percent (7%) ("Cap Percentage") on a cumulative basis. Until the Project is substantially complete (as reasonably determined by Landlord) for an entire calendar year, the foregoing limitation shall be initially calculated based on Tenant's initial estimated payments of Landlord's Operating Expenses as set forth herein. Upon the substantial completion of the Project for an entire calendar year, the foregoing limitation shall be re-calculated based on the actual amount of Landlord's Operating expenses for the first full calendar year in which the Project is substantially complete for an entire calendar year. For purposes hereof, "cumulative basis" shall mean that if any increase in Pass-Through Rent for Operating Expenses from one calendar year to the next is less than the Cap Percentage, then the difference between the CAP Percentage and actual percentage increase may be applied to any future increase(s) in Pass-Through Rent for Operating Expenses. By way of example, and not limitation, if Pass-Through Rent for Operating Expenses for the third calendar year increases by 6% from the second calendar year, and increases in the fourth calendar year by 8% from the third calendar year, Tenant's Pass-Through Rent for Operating Expenses for the fourth calendar year would be capped at 8% and would not have increased from year three to year four, on a cumulative basis, by more than seven percent (7%) because the difference between the CAP Percentage and the actual Pass-Through Rent for Operating Expenses increase from the second year (i.e., 7%-6%=1%) would be applied to the increase from the third year. The foregoing limitation shall not apply to "uncontrollable" Operating Expenses, and Tenant shall pay full Pass-Through Rent on "uncontrollable" Operating Expenses without limitation by the foregoing Cap Percentage. For purposes hereof, "uncontrollable" Operating Expenses shall mean insurance, trash removal, grease trap expenses, security, utilities, snowplowing and snow and ice removal/prevention and salting.

5.    REAL ESTATE TAXES.

5.1    Tenant's Obligation. Tenant shall pay Landlord, as part of Pass-Through Rent, Tenant's Pro Rata Share of Real Estate Taxes in the manner set forth in Article 4. Tenant shall pay only those Real Estate Taxes that become due and payable during the Term. Real Estate Taxes shall be prorated for the first and last years of the Term. Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to personal property located in the Premises.

Tenant shall not have the right to contest any taxes or assessments due and payable for the Property without the prior written consent from Landlord which shall not be unreasonably withheld and prior written consent of the Town of Normal and agrees, that, so long as this Lease is in full force and effect, Tenant shall not become an entity which is a tax exempt entity under Internal Revenue Code regulations.

Landlord will use its commercially reasonable efforts to subdivide the Retail Portion of the Property from the Residential Portion of the Property. Until Landlord is successful in obtaining such subdivision, each of Landlord and Tenant acknowledges and agrees that Taxes for the Retail Portion of the Property shall be equal to an amount which is 40% of the Taxes for the Property (the "Allocable Share"). Notwithstanding the foregoing, each of Landlord and Tenant agrees that the Allocable Share may be readjusted by Landlord and Tenant in the event either can reasonably demonstrate that amount paid by Tenant for Taxes is not comparable to what other similarly situated retail tenants are paying in the Main Street Corridor or Uptown Corridor in Normal, Illinois. Upon the delivery of such evidence, and the acceptance thereof, Landlord and Tenant shall adjust the Allocable Share hereunder.

5.2   Landlord's Obligation.  Landlord shall pay when due (subject to Landlord's right to protest) all Real Estate Taxes due and payable during the Term.  Landlord shall use such commercially reasonable means as are used by prudent owners of similar properties to fulfill the objective of achieving the lowest possible Real Estate Taxes for the Property and the Premises, including the challenging or contesting Real Estate Taxes.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of Landlord's costs reasonably incurred in conjunction with contesting such Real Estate Taxes and otherwise intended to minimize Real Estate Taxes.  With respect to any Real Estate Taxes of which Tenant has paid Tenant's Pro Rata Share, Landlord shall reimburse Tenant for Tenant's Pro Rata Share of any refund of Real Estate Taxes received as a result of any such challenge or contest.

6.   CONDITION OF THE PREMISES, POSSESSION.

6.1   Condition of the Premises.  Landlord represents and warrants that, as of the Turnover Date and subject to the completion of punchlist items, Landlord's Work (as defined in Section 6.2 below) and all structural parts of the Premises and the Project (excluding floor slab to be installed by Tenant) including, without limitation, the foundation, roof, exterior walls, plumbing, electrical and other mechanical systems installed by or on behalf of Landlord (a) will meet and comply with all applicable federal, state, and local laws, ordinances and regulations and all applicable handicapped accessibility standards, including, without limitation, those promulgated under the Americans With Disabilities Act ("ADA"), and (b) will be in good, workable and sanitary order, condition, and repair.  Tenant shall have the benefit of all warranties from Landlord's contractor with respect to Landlord's Work as required pursuant to Exhibit D. In addition, during the first Lease Year, Landlord shall promptly correct any latent defects relating to the HVAC system and other mechanical systems after Tenant notifies Landlord of any such defect. Upon discovery during the first Lease Year, Tenant shall

use commercially reasonable efforts to provide Landlord with prompt notice of any defect to the HVAC systems or other mechanical systems.

6.2   <u>Landlord's Obligation</u>.   Landlord shall complete all items identified as Landlord's obligation and described on <u>Exhibit D</u> attached hereto and by this reference incorporated herein to the Lease ("Landlord's Work") at its sole cost and expense in a good and workmanlike manner before delivering the Premises to Tenant.

Landlord shall notify Tenant in writing when Landlord's Work is substantially complete, and Tenant shall arrange promptly to inspect the Premises. At the time of Tenant's inspection, Landlord shall demonstrate all of Landlord's Work including all mechanical systems of the Premises. Within fifteen (15) days after Landlord delivers the Premises to Tenant, Tenant shall deliver to Landlord a written punchlist of all alleged incomplete or faulty items of construction or mechanical installation, and any necessary mechanical adjustments and finish work needed to bring the Landlord's Work into the condition required under this Article. Landlord shall repair all punchlist items, within Landlord's obligations hereunder, within thirty (30) days after the Turnover Date, or such longer period as is reasonably necessary, provided that Landlord is diligently pursuing the completion of such punchlist items.

If the Premises and the Project are not in the condition required under this Article on the Scheduled Turnover Date then Tenant may, at its option, either (a) delay acceptance of possession (and the Turnover Date) until the Premises and the Project are in the condition required under this Article and pursue its remedies under Article 2; or (b) accept possession of the Premises and complete all work necessary to bring the Premises into the required condition, provided that before Tenant accepts possession under this subsection (b), Tenant shall deliver a punchlist of incomplete Landlord's Work and thereafter Landlord shall have thirty (30) days to complete such punchlist items as are required to complete Landlord's Work, or such longer period as is reasonably necessary, provided that Landlord is diligently pursuing the completion of such punchlist items. If Tenant elects to proceed under the foregoing subsection (b), then Landlord shall reimburse Tenant, within thirty (30) days after receipt of Tenant's invoice, lien waivers and other evidence that the work has been completed lien-free as reasonably required by Landlord, for the reasonable and actual cost of such work.

6.3   <u>Tenant Allowance</u>.   In addition to Landlord's obligations under Sections 6.1 and 6.2 above, provided no monetary or material non-monetary default by Tenant (of which it has received notice) then exists, Landlord shall provide Tenant with an improvement allowance in the amount of thirty nine thousand five hundred twenty five Dollars (adjusted to equate to $15.00 per square foot) (the "Allowance") which shall be paid in full to Tenant within thirty (30) days after the latest to occur of:  (i) Tenant's opening for business to the public in the Premises, (ii) Tenant's payment to Landlord of the first month's Base Rent and Pass-Through Rent payment, and (iii) Tenant's providing Landlord with a sworn statement from Tenant's general contractor, reasonable evidence that all work has been paid for in full and copies of all lien waivers for Tenant's Work from Tenant's general contractor and subcontractors that provide work in excess of $5,000.00.

6.4    Floor Area.    If the total leaseable Floor Area of the Project increases during the Term, then Tenant's Pro Rata Share shall be adjusted accordingly.    In addition, at any time during the first six (6) months of the Term, Tenant may engage an independent certified architect or surveyor to measure the Floor Area of the Premises. If Tenant's architect or surveyor's measurement of the Floor Area is less than the floor area of the Premises set forth in the Reference Page by two percent (2%) or more, and Landlord's architect or surveyor does not reasonably disagree with Tenant's architect's or surveyor's measurement, then Base Rent and Tenant's Pro Rata Share shall be proportionally reduced.    If the variance is less than two percent (2%), then Landlord and Tenant shall make no adjustments to the Lease based upon that measurement.

7.    USE.

7.1    Use.    Tenant shall have the right to use the Premises for preparation and sale (with eat-in and take-out service) of (a) hamburgers, french fries, milkshakes and ice cream, custom juice drinks (commonly known as "smoothies"), salads, beverages (but not beer, wine, liquor or other alcoholic beverages), brewed coffee, breakfast sandwiches and other breakfast items, t-shirts, hats, mugs and other branded accessories; and (b) any other items sold in a substantial number of Tenant's other eat-in and take out service stores so long as sale of such items under this subsection (b) does not violate an exclusive use provision granted by Landlord to another tenant of the Project and does not violate or conflict with any prohibition on Tenant's use set forth herein.    Landlord represents and warrants that the foregoing permitted use set forth in subparagraph (a) does not and will not violate any other tenant's use or exclusivity clause or other restriction affecting the Property.    Landlord acknowledges that (i) incidental to Tenant's primary use, Tenant offers live and recorded indoor music for its customers, which does not violate any of the Project's rules or regulations, and (ii) odors and smoke are emitted during the normal operation of Tenant's use, which shall not be deemed noxious or offensive or violative of any of the Project's rules or regulations. Landlord shall not allow or permit any portion of the Project to be used for any noxious or offensive use or any other use that is inconsistent with the image of a first class retail center.

7.2    Compliance with Law.    During the Term, Tenant, at its expense, shall comply with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises, including but not limited to those pertaining to (a) the physical condition of any improvements constructed by Tenant in the Premises; and (b) Tenant's business operations in the Premises, including, without limitation, all ADA and other accessibility requirements unique to Tenant's use. Tenant shall not be required to make any seismic or structural upgrades, repairs, improvements or alterations to the Premises or the Project in order to comply with the requirements of this Section, unless such are required due to Tenant's particular use of the Premises as permitted under Section 7.1 or unless such are required in connection with Tenant's alteration of the Premises.    Landlord, at its sole cost and expense (but subject to Tenant's obligation to pay Tenant's Pro Rata Share of Operating Expenses), shall comply with all other applicable laws, rules, regulations, and ordinances made by any

governmental authority affecting the Premises, Project and/or the Property including, without limitation, all handicapped accessibility requirements.

7.3    Exclusivity.    Landlord hereby grants to Tenant the exclusive right and privilege at the Project to sell, except as otherwise permitted hereinafter, hamburgers and french fries (collectively, the "Exclusive Use Items").    Landlord shall not allow or permit any portion of the Project to be used or occupied by any person (other than Tenant) for the sale of Exclusive Use Items. ,Landlord represents and warrants that the foregoing exclusive use provision does not violate any existing tenant's use or exclusivity clause or other restriction affecting the Property.

7.4    Restrictions on Use.    The Restrictions on Use are listed in Exhibit G.

8.    MAINTENANCE, REPAIRS AND ALTERATIONS.

8.1    Tenant's Obligations.    Subject to the provisions of Sections 8.2 and 8.3 and Article 9, and except for damage caused by fire or other casualty, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises in good order and repair, including but not limited to maintaining all plumbing, black iron venting, Grease Trap (as defined below), HVAC (so long as Landlord assigns to Tenant all warranties applicable to the HVAC systems or permits Tenant to assert claims under warranties retained in Landlord's name, as provided below), electrical and lighting facilities and equipment within the Premises exclusively serving the Premises, and the store front, doors, and plate glass of the Premises. Landlord shall transfer or assign to Tenant (or permit Tenant to assert claims under warranties retained in Landlord's name) all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises to serve the Premises exclusively, including, without limitation, the warranty for the HVAC system. Notwithstanding any provision to the contrary, Tenant's obligations under this Section shall not include making (a) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other written agreement between Landlord and Tenant; or (b) any structural or seismic repairs, improvements or alterations to the Premises or the Project, unless such repairs, improvements or alterations are necessitated by Tenant's particular use of the Premises as permitted under Section 7.1. or Tenant's alteration of the Premises. Tenant shall be responsible for cleaning and shoveling the sidewalk in front of the Premises and maintaining the landscaping in front of the Premises.

Tenant shall make all repairs under this Section promptly after Tenant learns of the need for such repairs, but in any event within thirty (30) days after Landlord notifies Tenant of the need for such repairs. If Tenant fails to make such repairs within thirty (30) days after Landlord's notice (except when the repairs require more than thirty (30) days for performance and Tenant commences the repair within thirty (30) days and diligently and continuously pursues the repair to completion), Landlord may, at its option, undertake such repairs, and the reasonable costs thereof shall become due and payable as additional rent to Landlord together with Tenant's next Base Rent installment falling due after Tenant's receipt of an invoice for such costs.    Notwithstanding the

foregoing, in the event of an emergency, Landlord may give Tenant such shorter notice as is practicable under the circumstances, and if Tenant fails to make such repairs immediately, Landlord may immediately undertake such repairs, and the reasonable costs thereof shall become due and payable as additional rent to Landlord together with Tenant's next Base Rent installment falling due after Tenant's receipt of an invoice for such costs.

8.2    Landlord's Obligations.    Except for repairs and replacements to the Premises that Tenant must make under Section 7.1 and 8.1, Landlord shall pay for and make, or cause to be made, all structural repairs and/or replacements to the Premises and the Project (including the Common Areas). Except for repairs and replacements to the Premises that Tenant must make under Section 7.1 and 8.1, Landlord shall, at its sole cost and expense, make, or cause to be made, the repairs and replacements necessary to maintain the Project in a condition comparable to other first-class retail buildings. Such repairs, replacements and maintenance shall include the upkeep of the roof, foundation, exterior walls, interior structural walls (excluding paint and wall coverings in the Premises), and all structural components of the Project. Landlord shall also repair and maintain, or cause to be repaired and maintained, all parking areas, sidewalks, landscaping and drainage systems on the Property and all utility systems (including mechanical, plumbing and electrical systems) to the point of connection to the Premises, and plumbing systems which serve the Project as a whole. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store fronts of the Premises or any other item required to be maintained by Tenant under this Lease. Landlord shall make all repairs under this Section promptly after Landlord learns of the need for such repairs, but in any event within thirty (30) days after Tenant notifies Landlord of the need for such repairs. If Landlord fails to make such repairs within 30 days after Tenant's notice (except when the repairs require more than 30 days for performance and Landlord commences the repair within 30 days and diligently and continuously pursues the repair to completion), Tenant may, at its option, undertake such repairs and collect the reasonable cost thereof from Landlord. Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter notice as is practicable under the circumstances, and if Landlord fails to make such repairs immediately, Tenant may immediately undertake such repairs and collect the reasonable cost thereof from Landlord. Notwithstanding any provision to the contrary, Landlord's obligations under this Section shall not include making any repair or improvement caused by Tenant's failure to perform its obligations hereunder or under any other written agreement between Landlord and Tenant or any repair or improvement required to be made by Tenant under Section 7.1 or 8.1 of this Lease.

In connection with the performance by Landlord of any of its repair, replacement, maintenance or similar duties or activities it may be required or permitted to perform hereunder, Landlord shall use commercially reasonable efforts to not permit or allow any permanent or temporary obstructions, additions or alterations to the Project or Common Areas that would (a) materially impair access to, visibility or frontage of the Premises; (b) materially and adversely affect the conduct of Tenant's business from the Premises; or (c) materially and adversely affect the presentation of Tenant's signage or storefront.

8.3    Surrender.  Upon the expiration or termination of the Lease, Tenant shall surrender the Premises to Landlord in broom clean and in good condition and repair, except for ordinary wear and tear, damage caused by fire or other casualty, whether or not insured or insurable, and matters which are Landlord's responsibility to maintain and repair.

8.4    Landlord's Access.  Landlord shall have the right to enter the Premises upon at least twenty-four (24) hours' prior notice for the purpose of inspecting the same to ascertain Tenant's compliance with the Lease and for performing such maintenance or repairs to the Premises or to the Project as Landlord may be obligated to perform under the Lease, or to show the Premises to prospective purchasers and/or prospective or current lenders of the Project.  Notwithstanding the foregoing, in the event of an emergency requiring Landlord's entry into the Premises, Landlord shall not be required to give Tenant any prior notice, or may give Tenant shorter notice in any manner that is practicable under the circumstances.  Landlord may not, at any time, place on or about the Premises any "For Sale" or "For Lease" sign.  When entering or performing any repair or other work in the Premises, Landlord, its agents, employees and/or contractors (a) shall identify themselves to Tenant's personnel immediately upon entering the Premises, and (b) shall conduct themselves in a manner that does not unreasonably interrupt or interfere with Tenant's use, business or operations on the Premises or unreasonably obstruct the visibility of or access to the Premises.

8.5    Alterations and Additions.  With Landlord's prior written approval, Tenant, at Tenant's cost, may install such initial tenant improvements in the Premises as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements").  Landlord has heretofore approved Tenant's preliminary plans, trade dress and exterior elevation, a facsimile of which is attached to the Lease as Exhibit F. Tenant shall submit the final plans and specifications (the "Plans") for the Initial Improvements to Landlord for Landlord's review and approval as soon as reasonably practicable but in no event later than December 1, 2010.  Landlord shall have a period of thirty-five (35) days (the "Review Period") to review the Plans.  Landlord shall not unreasonably withhold, condition or delay its approval of the Plans.  Landlord shall be deemed to have approved the Plans as presented unless, on or before the last day of the Review Period, Landlord has delivered to Tenant a written description of the specific items in the Plans that do not materially conform to Exhibit F and that are not acceptable to Landlord, along with a reasonably detailed description of the specific changes that must be made to the Plans to secure Landlord's approval.  Tenant shall either (a) submit modified plans for approval; or (b) by written notice given no later than five (5) business days after Landlord's notice of disapproval, terminate the Lease if Landlord's requested revisions are not acceptable to Tenant.  The review and approval process described above shall continue until such time as Landlord has approved the Plans in writing.

After the installation of the Initial Improvements, Tenant may make such interior, non-structural alterations, improvements and additions to the Premises including, without limitation, changing color schemes, installing new countertops, flooring, wall covering and modifying the layout of the tenant fixtures, as Tenant deems necessary or

desirable, at a cost of Fifty Thousand Dollars ($50,000) or less per Lease Year, without obtaining Landlord's prior written consent; provided, however, that such interior, non-structural alterations, improvements or additions do not adversely affect the plumbing, electrical, HVAC or other building systems.   Other alterations, improvements and additions to the Premises shall require Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

Before commencing any alterations, additions or improvements using outside contractors, Tenant shall notify Landlord of the expected commencement and completion dates of the work.  Tenant shall not permit any mechanics' or materialmen's liens to be levied against the Premises for any labor or material furnished to Tenant or to its agents or contractors; provided, however, that Tenant shall not be required to pay or otherwise satisfy any claims or discharge such liens so long as Tenant, in good faith and at its own expense, contests the same or the validity thereof by appropriate proceedings and posts a bond or takes other steps acceptable to Landlord that stay enforcement of or insure over such lien. Tenant agrees to defend and indemnify Landlord against all liability, costs and damages arising from any such mechanics' or materialmen's liens.

8.6   Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings.  All personal property, furnishings, machinery and trade fixtures, equipment and improvements (trade or otherwise) that Tenant installs in the Premises ("Tenant's Property") shall remain the property of Tenant.  Upon the termination or expiration of the Term, Tenant shall remove Tenant's Property from the Premises.  In addition, Tenant may remove from the Premises all items (but excluding structural portions of the Premises) and characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, tradenames or copyrights.  Tenant shall repair any damage to the Premises caused by such removal, including patching and filling holes.  In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, utility or electrical components located inside the walls or HVAC systems.  All such work shall be completed on or before the termination or expiration of the Term.

In the event that Tenant acquires and/or leases Tenant's Property to be installed and used upon the Premises subject to a title retainage agreement, conditional sale contract, chattel mortgage or other security agreement or lease, Landlord agrees to execute and deliver to any such secured creditor and/or lessor a waiver of any lien Landlord may have upon Tenant's Property in form and content reasonably acceptable to Landlord.  Such waiver will be on a form provided by Tenant authorizing the secured creditor and/or lessor to enter upon the Property and remove Tenant's Property in the event of default under the terms of the security agreement and/or lease, provided that such secured creditor and/or lessor repairs any damage caused to the Premises by such removal. No such waiver of lien shall otherwise be deemed to amend or modify this Lease or any of Tenant's obligations hereunder.

Any of Tenant's Property not removed from the Premises on or before the date the Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. At Tenant's expense, Landlord may possess and dispose of such property, provided that nothing herein shall be deemed to grant Landlord or anyone holding under Landlord any right to use any trademark, trade name, copyrighted floor plan, copyrighted color palette, sign, or any other item that is protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant under the Lease.

8.7   Interruption of Services. Notwithstanding anything to the contrary contained in the Lease, if there is an interruption or discontinuance of the furnishing of any of the following utilities: gas, electricity, water and sewer, to the Premises caused by Landlord, which results in Tenant's inability to operate its business at the Premises for a period exceeding four (4) business days after Tenant notifies Landlord of such interruption (which notice may be verbal), Base Rent and Pass-Through Rent shall abate from the commencement of such period until such time as Tenant is able to resume the conduct of its business at the Premises following the restoration of said utility service.

9.   INSURANCE; INDEMNITY.

9.1   Tenant's Insurance. During the Term, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises (provided that such blanket policy contains an endorsement that names Landlord, Landlord's property manager and asset manager, if any, and Landlord's lender, if any, as an additional named insured, references the Premises, and guarantees a minimum limit available for the Premises equal to the insurance amounts required under the provisions of this Lease, not to exceed the limits specified in this Lease), and shall be maintained with an insurance company rated at least A-VIII or better in Best's Insurance Reports. Upon the execution of this Lease, and thereafter, at least ten (10) days prior to the expiration of Tenant's policies, Tenant will provide Landlord with a certificate(s) evidencing such insurance.

(a)   Personal injury, bodily injury and property damage (Commercial General Liability-to include without limitation contractual liability covering Tenant's obligations under Section 9.4) insurance, naming Landlord, Landlord's Project manager, if any, and Landlord's lender, if any, as an additional insured, against liability arising out of Tenant's use, occupancy, or maintenance of the Premises, Tenant's Outdoor Seating Area (as defined herein). Such insurance shall provide coverage for and shall be in an amount of not less than $1,000,000 for injury to or death of one person in any one accident or occurrence and in an amount of not less than $2,000,000 for injury to or death of more than one person in any one accident or occurrence. Tenant's insurance shall be primary with respect to any claim arising out of events that occur in the Premises, and shall name Landlord, its agents, servants, employees, Project manager, if any, and lenders, if any, as additional insureds. No change in any Tenant insurance policy shall be effected without the written consent of Landlord. Such Tenant policy shall contain an

agreement by the insurer that such policy shall not be cancelled without at least ten (10) days' prior written notice to Landlord. Tenant shall also maintain worker's compensation coverage for the Illinois statutory limits, but at least including employer's liability limits of not less than $500,000 each accident/injury; $500,000 each employee/disease and $500,0000 policy limit. Landlord shall have the right from time to time to increase the types and limits of the Commercial General Liability insurance policy to be carried by Tenant during the Term, if in Landlord's reasonable judgment, such increase is necessary to bring such coverage in line with those generally required to be carried by similar businesses in similar locations.

(b)     Commercial property form (Special Cause of Loss Form (All Risk) insurance with a special form endorsement to the extent of the full replacement value of Tenant's fixtures, equipment and inventory in the Premises. During the Term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate the Lease under Section 9 hereof. Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's Property and Landlord shall sign all documents that are necessary or appropriate in connection with the settlement of any claim or loss by Tenant. Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Project. Tenant shall deliver such policies or certificates evidencing such coverage to Landlord upon execution of this Lease, and thereafter not less than ten (10) days prior to the expiration date of any such policy.

9.2     Landlord's Insurance. During the Term, Landlord shall obtain and keep in full force and effect, the following insurance from an insurance company rated at least A-VIII or better in Best's Insurance Reports. The insurance required to be carried by Landlord under this Section shall be referred to herein as "Landlord's Insurance." Landlord's costs and expenses for Landlord's Insurance and such other insurance Landlord may carry with respect to the Project shall be referred to herein as "Landlord's Insurance Expenses". Upon Tenant's request, Landlord will provide Tenant with a copy of the certificate evidencing Landlord's Insurance.

(a)     Bodily injury, personal injury and property damage insurance (to include without limitation contractual liability covering Landlord's obligations under Section 9.5) insuring against claims of bodily injury or death, personal injury or property damage arising out of or in connection with (a) Landlord's activities upon, in or about the Premises; or (b) the use or occupancy of the Project in a limit of not less than $1,000,000 for injury to or death of one person in any one accident or occurrence and in an amount of not less than $2,000,000 for injury to or death of more than one person in any one accident or occurrence. Landlord's Insurance shall be primary with respect to any claim arising out of events that occur outside the Premises.

(b)     Commercial property form insurance insuring the Project (excluding any property which Tenant is obligated to insure under Section 9.1), against damage and destruction by fire, vandalism, flood (if available), and other perils in the amount of the full replacement value of the Project, as such value may exist from time to time (or, in the case of flood insurance, the maximum amount permitted by applicable legal

requirements and regulations in the event insurance in the amount of the full replacement value of the Project is not available pursuant to such requirements and/or regulations).

9.3    Waiver of Claims and Subrogation.    Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents, employees, guests or invitees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to the Lease (and each hereby waives any such claims against the other).    Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

9.4    Indemnification by Tenant.    Subject to and to the extent of the waiver of claims set forth in Section 9.3, Tenant shall indemnify, defend and hold harmless the Landlord Indemnitee(s) of, from and against any and all Claims that any Landlord Indemnitee may incur arising out of (a) injuries occurring within the Premises, the Outdoor Seating Area, if any, during times Tenant is operating the Outdoor Seating Area; (b) any willful acts or negligence of Tenant or Tenant's agents, employees, or contractors; or (c) the failure of any representation or warranty made by Tenant herein to be materially true when made, except that Tenant's indemnity shall not apply to the extent any of the foregoing arises out of the willful or negligent acts or omissions of any Landlord Indemnitee.    This indemnity shall survive termination of the Lease only as to claims arising out of events that occur prior to termination of the Lease.

9.5    Indemnification by Landlord.    Subject to and to the extent of the waiver of claims set forth in Section 9.3, Landlord shall indemnify, defend and hold harmless the Tenant Indemnitee(s) of, from and against any and all Claims that any Tenant Indemnitee may incur arising out of (a) injuries occurring in the Common Areas or any other portion of the Project outside the Premises that are within Landlord's control (but not including space leased and occupied by another tenant); (b) any willful acts or negligence of Landlord or Landlord's agents, employees, or contractors; or (c) the failure of any representation or warranty made by Landlord herein to be materially true when made, except that Landlord's indemnity shall not apply to the extent any of the foregoing arises out of the willful or negligent acts or omissions of any Tenant Indemnitee.    This indemnity shall survive termination of the Lease only as to claims arising out of events that occur prior to termination of the Lease.

10.    HAZARDOUS SUBSTANCES.

10.1    Tenant's Covenants.    Tenant represents, warrants, and agrees that Tenant shall not use, manufacture, store, release, discharge or dispose of any Hazardous Substance on, under, or about the Premises, the Project or the Property, except that Tenant may use, store, release, discharge or dispose of in its operations customary office products and cleaning products in accordance with the Environmental

Laws. Tenant shall comply with all applicable Environmental Laws in connection with its use of the Premises.

10.2 <u>Landlord's Covenants</u>. Landlord represents, warrants, and agrees as follows: (a) to its knowledge (based on commercially reasonable investigation) no Hazardous Substance has been used, manufactured, stored, released, discharged or disposed of on, under or about the Premises, the Project or the Property (or off-site of the Premises which might affect the Premises, the Project or the Property) in violation of Environmental Laws, and (b) Landlord shall not (and shall require other tenants of the Project to not) use, manufacture, store, release, discharge or dispose of any Hazardous Substance on, under, or about the Project or the Property, except that Landlord (and such tenants) may use, store, release, discharge or dispose of in its (or their) operations products customarily used in their permitted uses in accordance with the Environmental Laws. Landlord shall (and shall require other tenants of the Project to) comply with all applicable Environmental Laws in connection with its (or their) use, occupancy, management or operation of the Project and the Property (or, in the case of such tenants, their premises). Landlord further represents and warrants that, except as set forth in the Phase I prepared by Atwell Hicks, LLC dated July 28, 2006 and the Phase I prepared by Atwell Hicks, LLC dated July 2, 2007, to Landlord's knowledge the soil, groundwater and soil vapor on or under the Premises and the Property are or will be free of Hazardous Material as of the Possession Date.

10.3 <u>Hazardous Substance Indemnity</u>. Tenant shall indemnify, defend and hold harmless the Landlord Indemnities, and Landlord shall indemnify, defend and hold harmless the Tenant Indemnities, of, from and against any and all Claims and any and all Remediation Costs the indemnified party may incur arising out of or in connection with: (i) the indemnifying party's violation of Environmental Laws with respect to the Premises, the Project or the Property (except to the extent the same arises out of or in connection with the use, manufacture, storage, release, discharge or disposal of Hazardous Substances by the indemnified party or its agents, contractors or employees); or (ii) a breach of any representation, warranty, or agreement of the indemnifying party contained in this Section. This indemnity shall survive termination of the Lease only as to claims arising out of events that occur prior to termination of the Lease.

11.　DAMAGE OR DESTRUCTION.

11.1 <u>Material Damage</u>. If the Premises or the Project is damaged or destroyed by fire or any casualty, then, within thirty (30) days after the date of such damage, Landlord shall determine how long the repair and restoration will take ("Landlord's Repair Estimate"). If Landlord determines that the repair and restoration cannot, despite diligent, good faith efforts be completed within one hundred eighty (180) days after the date on which such damage occurs, then (a) either Landlord or Tenant shall have a period of thirty (30) days after such determination to elect to terminate the Lease by giving notice to the other, and (b) if Landlord decides to demolish the Project and not to replace it with a similar building, Landlord shall have a period of thirty (30) days after

such determination to elect to terminate the Lease by giving notice to Tenant, so long as Landlord also terminates the leases of all other tenants in the Project.

11.2    Repair After Damage.   If Tenant or Landlord does not elect (or have the right to elect) to terminate the Lease as provided in Section 11.1, then Landlord shall, subject to Landlord's receipt of insurance proceeds and all necessary permits and other approvals required to repair such damage and restoration, and the provisions of this Section, immediately commence and diligently and continuously pursue to completion the repair of such damage and restoration of the Premises so that the Premises and the Project are restored to a condition of similar quality, character and utility for Tenant's purposes, including restoration of all items identified as Landlord's obligation and described on Exhibit D existing in the Premises prior to such damage.  Notwithstanding anything contained herein to the contrary, if the repair and restoration are not so completed and Landlord has not delivered possession of the Premises to Tenant within thirty (30) days after the initially scheduled completion date set forth in Landlord's Repair Estimate (excluding force majeure), then Tenant may elect to terminate the Lease, so long as Tenant delivers ten (10) days' prior written notice thereof to Landlord and the repair and restoration are not so completed and possession is not so delivered before the expiration of that ten (10) day period.  If Tenant does not terminate, during the ten (10) day period after the expiration of the thirty (30) day period following the scheduled completion date, then Landlord shall continue to diligently pursue to completion the repair of such damage and restoration of the Premises.  Tenant shall repair its improvements as it deems reasonably necessary to operate it business. Landlord shall not be required to expend more than the amount of insurance proceeds received and the deductible for such repair or restoration.

11.3    Uninsured Damage.   If any damage or destruction is caused by a peril not required to be insured against under the Lease and for which insurance proceeds are not available, either Landlord or Tenant may terminate the Lease by giving thirty (30) days' prior written notice to the other of its election so to do, and the Lease shall terminate as of the date of such damage unless the other party agrees in writing to pay for such repairs or restoration.

11.4    Damages During Final Two Years.   If any structural damage or destruction occurs to the Premises during the last two (2) years of the Initial Term or any Extension Term then in effect, and the portion of the cost of repair or restoration that is not covered by insurance exceeds $100,000, either Landlord or Tenant may terminate the Lease by giving thirty (30) days' prior written notice to the other of its election so to do, and the Lease shall terminate as of the date of such damage; provided, however, that if Landlord notifies Tenant that it wishes to terminate the Lease, then Tenant may, if it has not already done so, exercise its right to extend the Term under Section 2.6 whereupon Landlord's election to terminate shall be null and void.

11.5    Abatement of Rent.   If Landlord is required to repair or restore the Premises and/or the Project under any provision of this Article and Tenant is not able to use the Premises, then until Landlord completes such repair or restoration, Base Rent, Pass-Through Rent and all other charges payable by Tenant hereunder shall be abated.

11.6   Termination.  In the event of a termination of the Lease under this Article, Landlord shall return any prepaid Base Rent and other prepaid amounts to Tenant within thirty (30) days after the date of termination.  Any termination of the Lease under this Article shall be effective as of the date of such damage or destruction.

12.   CONDEMNATION.

12.1   Condemnation of Premises.  If any portion of the Premises is taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of said power (the act of which is herein referred to as "condemnation"), the Lease shall terminate as to the part so taken as of the earlier of:  (i) the date upon which the title to the Premises is transferred to such condemning authority, or (ii) date upon which the condemning authority takes possession of the condemned portion of the Premises (the "Condemnation Date").  If the entire Premises are condemned, then the Lease shall automatically terminate as of the Condemnation Date.  The party who receives the condemnor's notice of intention to take (the "Condemnation Notice") shall promptly give a copy of such notice to the other party.

12.2   Condemnation of the Property – Premises Not Suitable.  If as a result of any condemnation of the Property or any portion thereof (even though the Premises might not be physically affected) the Premises is no longer reasonably suited for the conduct of Tenant's usual business in Tenant's sole judgment, reasonably exercised, then Tenant may terminate the Lease at any time after Tenant receives the Condemnation Notice by giving Landlord thirty (30) days' prior written notice.

12.3   Condemnation of the Property – Project Not Suitable .  If a condemnation of any portion of the Property (even though the Premises might not be physically affected) renders the Project unsuitable for its use prior to such condemnation (in either party's sole judgment, reasonably exercised), then either Landlord or Tenant may terminate the Lease by giving the other at least thirty (30) days' prior written notice, provided that, in the case of a termination by Landlord, Landlord is also terminating the leases of all other tenants in the Project.

12.4   Restoration.  If the Lease is not terminated as described above, (a) it shall remain in full force and effect as to the portion of the Premises remaining, and Base Rent and all other charges payable hereunder shall be reduced in the same proportion that the area of the Premises taken bears to the total area of the Premises prior to taking, and (b) Landlord shall use the condemnation award to restore the Premises and the Project as soon as reasonably practicable to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation. Notwithstanding anything contained herein to the contrary, if the restoration of the Premises and/or the Project is not commenced within thirty (30) days after Landlord's receipt of the condemnation award or is not completed within one hundred eighty (180) days after the Condemnation Date, then Tenant may elect to terminate the Lease, so long as Tenant delivers ten (10) days' prior written notice thereof to Landlord and the restoration is not so completed before the expiration of that ten (10) day period.   If Tenant does not terminate within ten (10) days after the expiration of the dates set forth

in the immediately preceding sentence, then Landlord shall continue to diligently pursue to completion the restoration of the Premises. In no event shall Landlord be required to expend for the restoration of the Premises and/or the Project more than the amount of the condemnation proceeds received by Landlord.

12.5   <u>Abatement of Rent</u>.   If Landlord is required to repair or restore the Premises and/or the Project under any provision of this Article and Tenant's use of the Premises is materially and adversely affected, then until Landlord completes such repair or restoration, Base Rent, Pass-Through Rent and all other charges payable by Tenant hereunder shall abate based on the degree of impact such damage and repairs have on Tenant's operations within the Premises as measured by the proportionate reduction in Tenant's sales volume.

12.6   <u>Award</u>.   Landlord and Tenant may each pursue any condemnation award to which it is entitled by applicable law, except that Tenant agrees that it shall limit its claim to compensation for damage to its business by reason of the taking; moving expenses; furniture, fixtures and equipment; and unamortized tenant improvement costs.

12.7   <u>Termination</u>.   In the event of a termination of the Lease under this Article, Landlord shall return any prepaid Base Rent and other prepaid amounts to Tenant within thirty (30) days after the date of termination.

13.   <u>UTILITIES</u>.

Except to the extent otherwise provided by Landlord and/or included in the calculation of Operating Expenses, Tenant shall pay for all water/sewer, gas and electricity used by Tenant during the Term, all of which shall be measured through proper and sufficient meters, or submeters installed at Landlord's expense. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable share of all charges for utilities jointly metered with other premises. If all tenants using utilities measured by a joint meter have comparable usages, Tenant's share shall be the portion of the charges for such utilities equal to the ratio which the square footage of the Premises bears to the total square footage of the premises or other space served by the joint meter. If usages are not comparable, Tenant's share shall be in equitable proportion to such other users based upon Tenant's use of such utility service. Landlord shall not charge Tenant a rate for any utility in excess of the rate Landlord pays to the supplier of the service. Tenant shall have the right to sufficient utilities and ventilation necessary to support its intended use of the Premises. Tenant shall have the right to access to such portions of the project outside the Premises as are reasonably necessary to enable Tenant to access its utilities. Landlord shall pay any tap-in fees imposed by governmental authorities for Tenant's initial connection to any utilities serving the Premises.

14.   <u>ASSIGNMENT AND SUBLETTING</u>.

Tenant shall not assign all or any portion of the Lease or sublease all or any portion of the Premises without the prior written consent of Landlord, which consent

shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Tenant may, without Landlord's consent, assign all or any portion of the Lease or sublease all or any portion of the Premises to a Tenant Affiliate. The consent by Landlord to any assignment or sublease shall not constitute a waiver of the necessity of such consent to any subsequent assignment or sublease. Each assignment of sublease to which Landlord has consented shall be by an instrument in writing by such party for the benefit of Landlord to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant. One executed copy of such written instrument in form satisfactory to Landlord shall be delivered to Landlord prior to the effective date of such assignment or sublease. It shall be deemed reasonable for Landlord to withhold its consent to a assignment or sublease if the use of the proposed assignee or sublessee is inconsistent with the image of a first class retail center.

Landlord shall not be entitled to any consideration in connection with any assignment or sublease. Notwithstanding the foregoing, however, all requests for Landlord's consent shall be in writing. If Landlord's consent is required, then Tenant shall promptly reimburse Landlord for all expenses, including reasonable attorneys' fees, incurred by Landlord in conjunction therewith in any manner whatsoever.

Unless released in writing, Tenant shall remain liable under the Lease following any assignment or sublease.

15.   DEFAULTS; REMEDIES.

15.1   Tenant Default.   The occurrence of any one or more of the following events shall constitute a "Tenant Default":

(a)   The failure by Tenant to make any payment of Base Rent, Pass-Through Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure continues for a period of five (5) business days after notice thereof from Landlord; or

(b)   The failure by Tenant to observe or perform any of the agreements, conditions, or provisions of the Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure continues for a period of thirty (30) days after notice thereof from Landlord to Tenant; provided, however, that if the nature of the failure is such that more than thirty (30) days are reasonably required for its cure, then a Tenant Default shall not be deemed to exist if Tenant commences cure within such thirty (30) day period and thereafter diligently pursues such cure to completion; or

(c)   The failure of any representation or warranty of Tenant to be true when deemed given hereunder, unless the fact upon which such untruth is based can be corrected, in which case no Tenant Default shall be deemed to exist if Tenant corrects such fact within thirty (30) days after notice thereof from Landlord to Tenant; provided, however, that if the nature of such factual misrepresentation is such that more than

thirty (30) days are reasonably required for its correction, then a Tenant Default shall not be deemed to exist if Tenant commences such correction within such thirty (30) day period and thereafter diligently pursues such correction to completion.

15.2   <u>Remedies for Tenant Default</u>.   In the event of any Tenant Default, Landlord shall have the following rights and remedies, which shall not operate to exclude Landlord from the exercise of any other right or remedy allowed it hereunder by law:

(a)   Landlord may terminate the Lease by giving to Tenant notice of the Landlord's intention so to do, in which event the Term shall end, and all right, title and interest of Tenant hereunder shall expire, on the date stated in such notice; or

(b)   Landlord may terminate the right of Tenant to possession of the Premises without terminating the Lease by giving notice to Tenant that Tenant's right of possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice but Tenant's obligations under the Lease shall continue in full force and effect.

If Landlord exercises either of the remedies provided for above, Tenant shall surrender possession and vacate the Premises immediately and deliver possession thereof to Landlord, and Landlord may reenter then, or at any time thereafter, and take complete and peaceful possession of the Premises, with or without process of law (subject to applicable law), full and complete license so to do being granted to Landlord, and Landlord may remove all occupants and property therefrom, using such force as may be necessary (subject to applicable law), without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and without relinquishing Landlord's right to Base Rent, Pass-Through Rent, or any other right given to Landlord hereunder or by operation of law.

If Landlord terminates the right of Tenant to possession of the Premises without terminating the Lease, such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay the Base Rent and Pass-Through Rent hereunder for the full stated Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Base Rent and any other sums then due under the Lease and thereafter accruing as they become due under the Lease during the period from the date of such notice of termination of possession to the end of the Term.  Landlord may file suit from time to time to recover any such sums and no suit or recovery by Landlord of any such sums or portion thereof shall be a defense to any subsequent suit brought for any other sums due under the Lease.

In the event that Landlord terminates the right of Tenant to possession of the Premises without terminating the Lease as provided in the foregoing paragraph and subject to applicable law, Landlord may relet the Premises or any part thereof, but shall be under no obligation to do so, for the account of Tenant for such rent, for such time (which may be for a term extending beyond the Term) and upon such terms as Landlord in its sole discretion shall determine.  Also, in any such event, Landlord may make

repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable, and, in connection therewith, change the locks to the Premises, and Tenant, upon demand shall pay the reasonable cost thereof together with Landlord's reasonable expenses of reletting. Landlord may collect the rents from any such reletting and apply the same first to the payment of the expenses of reentry, redecoration, repair and alterations and the expense of reletting (including without limitation brokers' commissions and reasonable attorneys' fees) and second to the payment of Base Rent and other sums due from Tenant hereunder. Any excess or residue shall operate only as an offsetting credit against the amount of Base Rent and other sums due from Tenant hereunder as the same theretofore became or thereafter becomes due and payable hereunder, but the use of such offsetting credit, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue and any such excess or residue shall belong to Landlord solely. No such reentry, or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of Tenant, an election on Landlord's part to terminate the Lease or an acceptance of a surrender of the Lease, unless a notice of such intention be given to Tenant, or shall operate to release Tenant in whole or in part from any of Tenant's obligations hereunder. Landlord, at any time and from time to time, may sue and recover judgment for any deficiencies remaining after the application of the proceeds of any such reletting.

In the event of the termination of the Lease by Landlord as provided for by subparagraph (a) of this Section or otherwise, Landlord shall be entitled to recover from Tenant all Base Rent and Pass-Through Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional sums then due and payable by Tenant hereunder. In addition, Landlord shall be entitled to recover the aggregate sum which at the time of such termination represents the excess, if any, of the present value of the aggregate Base Rent at the same annual rate for the remainder of the Term as then in effect over the then present value of the then aggregate fair rental value of the Premises for the balance of the Term, immediately prior to such termination.

All property removed from the Premises by Landlord pursuant to any provisions of the Lease or of law, may be handled, removed or stored by Landlord at the cost, expense and risk of Tenant, and Landlord in no event shall be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord upon demand for all expenses incurred by Landlord in such removal and storage.

In the event of any Tenant Default, Landlord shall use commercially reasonable efforts to mitigate damages, including attempting to obtain another tenant for the Premises at a fair market rental.

15.3    Landlord Default. The occurrence of any one or more of the following events shall constitute a "Landlord Default":

(a)    The failure by Landlord to make any payment required to be made by Landlord hereunder, as and when due, where such failure continues for a period of five (5) business days after written notice thereof from Tenant; or

(b)    The failure by Landlord to observe or perform any of the agreements, conditions, or provisions of the Lease to be observed or performed by Landlord, other than the payment of sums due hereunder, where such failure continues for a period of thirty (30) days after notice thereof from Tenant to Landlord; provided, however, that if the nature of the failure is such that more than thirty (30) days are reasonably required for its cure, then a Landlord Default shall not be deemed to exist if Landlord commences cure within such thirty (30) day period and thereafter diligently pursues such cure to completion; or

(c)    The failure of any representation or warranty of Landlord to be true when deemed given hereunder, unless the fact upon which such untruth is based can be corrected, in which case no Landlord Default shall be deemed to exist if Landlord corrects such fact within thirty (30) days after notice thereof from Tenant to Landlord; provided, however, that if the nature of such factual misrepresentation is such that more than thirty (30) days are reasonably required for its correction, then a Landlord Default shall not be deemed to exist if Landlord commences such correction within such thirty (30) day period and thereafter diligently pursues such correction to completion.

15.4    Remedies for Landlord Default.    In the event of any Landlord Default, Tenant shall have the following rights and remedies, which shall not operate to exclude Tenant of any other right or remedy allowed it hereunder by law:

(a)    Tenant may pursue the remedy of specific performance; or

(b)    Tenant may seek money damages for loss arising from Landlord's failure to discharge its obligations under the Lease; provided, however, that in no event shall Tenant be entitled to consequential or special damages.

Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section be construed to obligate Tenant to perform Landlord's repair obligations.

16.    SIGNAGE.

Tenant shall have the right to place signs and advertisements (including pre-opening, temporary and promotional signs and advertisements) on the interior of the Premises (but not the plate glass, except as set forth on Exhibit F), so long as such signs comply with applicable codes and ordinances.    Landlord hereby approves Tenant's trade name, logo sign, pre-opening signage, and trade dress, a facsimile of which is attached to the Lease as Exhibit F. Landlord hereby approves of the installation of a lighted sign above the storefront and in the display window of the Premises in accordance with Exhibit F. Other signage shall require Landlord's reasonable approval. If available, Tenant shall also be permitted to have an identifying sign included on any lighted sign, reader board, pylon or directory, if any, established or erected by Landlord. In such case, Tenant shall pay for the sign panel and shall reimburse Landlord for the

installation and maintenance of such sign panel based upon the area of Tenant's sign panel compared to the total area of sign panels on the lighted sign, reader board, or pylon. Landlord shall not remove any of Tenant's exterior signage during the Term without first obtaining Tenant's prior written consent. Tenant acknowledges that if a monument sign or pylon sign is erected on the Premises, Chipotle will have the right to the first position on both sides of the sign.

17.    OUTDOOR SEATING.

If such seating is permitted by the governmental authorities with proper jurisdiction, Tenant may provide outdoor seating for its customers on property owned by Landlord adjacent to the Premises (as shown on Exhibit B the "Outdoor Seating Area") at any time during the Term at no additional rental. Tenant, at its cost, shall comply with all relevant state, municipal or local laws, regulations, rules or ordinances with respect to Outdoor Seating Area, and obtain all necessary permits or licenses for the same. To the extent Tenant uses the Outdoor Seating Area, it shall maintain the Outdoor Seating Area exclusively serving its customers in a reasonably clean and neat fashion including but not limited to maintaining in a broom-clean condition, removal of snow and ice, maintain landscaping, repair and replace improvements as deemed necessary, and keep the Outdoor Seating Area clear of hazardous conditions. Tenant shall have the right to enclose Outdoor Seating Area by installing a railing or other appropriate barrier that meets with all applicable code and is reasonably consistent with the railings or other appropriate barriers used by Tenant in the geographic area in which the Premises is located.

The Outdoor Seating Area shall not interfere with ingress or egress along any sidewalks or other means of passage in the Project. In the event that Tenant is not permitted to have the Outdoor Seating Area, same will not affect this Lease, which shall remain in full force and effect.

18.    PARKING AND ACCESS.

Landlord shall provide parking spaces for Tenant's employees and customers in common with other tenants and occupants of the Project, at no charge to Tenant. Except as may be shown on the site plan attached hereto or as required by governmental authorities with jurisdiction over the Project, Landlord shall not materially adversely vary or permit to be materially adversely varied the existing means of ingress and egress to the Project and the Property. Landlord represents and warrants to its knowledge that as of the date hereof there is no restrictive covenant, easement or other similar agreement concerning parking requirements or site density (nor shall it agree to any modification thereof) that would limit the number of employees or patrons at or within the Premises. Landlord shall not reduce the number of parking spaces below the number required by law for Tenant to use and occupy the Premises for the uses permitted under Section 7.1(a) of this Lease.

Tenant shall cause its employees to park in parking spaces located outside of the Property but within reasonable proximity to the Property and well lighted; provided,

however, the manager of Tenant's business operations may park his or her automobile in the parking area servicing the Property. Tenant acknowledges and agrees that (i) it is not entitled to any reserved parking at the Property and (ii) its agents, servants, employees, contractors, customers and invitees shall not have the right to park in the area shown on **Exhibit B** as "Residential Parking." Landlord shall use its commercially reasonable efforts to ensure that occupants of the Residential Portion of the Property shall not have the right to park in the area marked "Retail Parking" on the Site Plan. Landlord shall monitor the use of the parking at the Property, provided that any reasonable costs or expenses incurred in connection therewith including, without limitation, any security personnel engaged by Landlord, shall be included in Common Area Charges and considered a Non-Controllable Common Area Charge. Landlord represents and warrants to Tenant that each retail tenant in the Building shall not be permitted more than one (1) parking space for utilization by its manager.

19.   TRASH REMOVAL AND GREASE TRAP.

19.1 <u>Trash Removal</u>.   Landlord will supply an area on the Property for a dumpster (the "Dumpster") in the area identified as the Dumpster Area on Exhibit A (the "Trash Enclosure") hereto which Tenant and other occupants of the Retail Portion of the Property shall use on a non-exclusive basis. Tenant acknowledges and agrees that occupants of the Retail Portion of the Property will collectively utilize the Trash Enclosure. Landlord shall contract for and provide trash collection services as part of the Common Area Charges which shall occur no less than five (5) days per week, provided, however, in the event it becomes necessary, in Tenant's sole but reasonable opinion, for trash collection services to occur more than five (5) days per week, Landlord shall make arrangements for such trash collection services to occur at least six (6) days per week. Tenant shall also have the right to locate a 3' x 3' grease receptacle within the Trash Enclosure for Tenant's exclusive use. Tenant shall pay its Proportionate Share of the charges associated with the use of the Dumpster in the Trash Enclosure. Landlord shall provide Tenant with either a key or keycard which permits the opening of the Trash Enclosure for trash disposal.

Tenant shall have the right to audit the joint trash usage and request that the Maximum Trash Percentage be reduced to accurately reflect the maximum percentage that can be allocated to the Retail Portion of the Property. Such new percentage shall be mutually agreed to by Landlord and Tenant.

19.2 Grease Trap. Except as set forth below, Landlord shall maintain, repair and replace the grease trap (the "Grease Trap") constructed and installed by Landlord in accordance with Exhibit D for Tenant's shared use. Within thirty (30) days after Tenant's receipt of an invoice from Landlord with reasonable backup enclosed, Tenant shall reimburse Landlord for Tenant's proportionate share (based on the number of joint users) of the actual and reasonable costs incurred by Landlord in connection with the installation of said Grease Trap, in an amount not to exceed $3,750.00 (the "Initial Installation Costs"). If the Grease Trap is constructed and installed by Landlord such that it is to be utilized by Tenant for its exclusive use, Tenant shall (i) within thirty (30) days after Tenant's receipt of an invoice from Landlord with reasonable backup

enclosed, reimburse Landlord for the actual and reasonable costs incurred by Landlord in connection with the installation of said Grease Trap, in an amount not to exceed $7,500.00 and (ii) maintain, repair and replace the Grease Trap during the Term at its cost and expense. In the event that the Grease Trap is constructed and installed by Landlord such that it is to be utilized by Tenant for its exclusive use, Landlord shall not be permitted to connect any joint user to the Grease Trap. In the event the maintenance, repair and replacement obligations of the Grease Trap are the responsibility of Landlord as set forth in the immediately preceding sentence, Landlord shall promptly maintain, repair and replace such Grease Trap and Tenant shall reimburse Landlord for its proportionate share of the actual costs incurred by Landlord in maintaining, repairing and replacing the jointly used Grease Trap within thirty (30) days of Tenant's receipt of an invoice thereof from Landlord. If all tenants using the shared Grease Trap have comparable usages, Tenant's share shall be equal to the ratio which the square feet of floor area of the Premises bears to the total square feet of floor area served by the jointly used Grease Trap. If usages are not comparable, Tenant's share shall be such equitable proportion as Landlord and Tenant may mutually agree upon.

## 20.   REPRESENTATIONS AND WARRANTIES

20.1   Tenant Representations. To induce Landlord to execute, deliver and perform the Lease and without regard to any independent investigations made by Landlord, Tenant represents and warrants to Landlord on and as of the date of execution and delivery of the Lease as follows:

(a)   Tenant has full capacity, right, power and authority as an Illinois limited liability company to execute, deliver and perform the Lease and all documents to be executed by Tenant pursuant hereto, and all required action and approvals therefore have been duly taken and obtained. The individuals signing the Lease and all other documents executed or to be executed pursuant hereto on behalf of Tenant are and shall be duly authorized to sign the same on Tenant's behalf and to bind Tenant thereto. The Lease and all documents to be executed pursuant hereto by Tenant are and shall be binding upon and enforceable against Tenant in accordance with their respective terms, subject to the effects of bankruptcy and creditors' rights generally, and the transaction contemplated hereby will not result in a breach of, or constitute a default or permit acceleration of maturity under, any indenture, mortgage, deed of trust, loan agreement or other agreement to which Tenant or is subject or by which Tenant is bound, the breach of or default or acceleration under which would have a materially adverse effect on its business.

(b)   There are no claims, causes of action or other litigation or proceedings pending or, to the best of Tenant's knowledge, threatened in respect to its business operations (including disputes with mortgagees, governmental authorities, contractors, or suppliers of goods or services).

20.2 <u>Landlord Representations</u>. To induce Tenant to execute, deliver and perform the Lease and without regard to any independent investigations made by Tenant, Landlord represents and warrants to Tenant on and as of the date of execution and delivery of the Lease as follows:

(a) Landlord has full capacity, right, power and authority to execute, deliver and perform the Lease and all documents to be executed by Landlord pursuant hereto, and all required action and approvals therefore have been duly taken and obtained. The individuals signing the Lease and all other documents executed or to be executed pursuant hereto on behalf of Landlord are and shall be duly authorized to sign the same on Landlord's behalf and to bind Landlord thereto. The Lease and all documents to be executed pursuant hereto by Landlord are and shall be binding upon and enforceable against Landlord in accordance with their respective terms, subject to the effects of bankruptcy and creditors' rights generally, and the transaction contemplated hereby will not result in a breach of, or constitute a default or permit acceleration of maturity under, any indenture, mortgage, deed of trust, loan agreement or other agreement to which Landlord or the Property is subject or by which Landlord or the Property is bound, the breach of or default or acceleration under which would have a materially adverse effect on its business.

(b) To Landlord's knowledge (based on commercially reasonable investigation) there are no claims, causes of action or other litigation or proceedings pending or threatened in respect to the ownership, operation or environmental condition of the Property or any part thereof (including disputes with mortgagees, governmental authorities, utility companies, contractors, adjoining land owners or suppliers of goods or services).

(c) As of the Turnover Date, Landlord will own the Property in fee simple, free of any liens, claims or encumbrances other than title exceptions that do not unreasonably interfere with Tenant's permitted use of the Premises.

(d) To Landlord's knowledge (based on commercially reasonable investigation), there are no violations of any health, safety, pollution, zoning or other laws, ordinances, rules or regulations with respect to the Property, which have not been heretofore entirely corrected. In the event Landlord has knowledge of any such violations, Landlord shall cure or cause to be cured such violations prior to the date that Tenant takes possession of the Premises; provided, if such matters cannot be reasonably cured prior to such date and Landlord has commenced to cure the same within a reasonable time after receiving notice of such violation, Landlord shall have such additional time as is reasonably required to cure the same.

21. <u>QUIET ENJOYMENT</u>.

Without limiting any rights Tenant may have by statute or common law, Landlord agrees that, so long as the Lease is in full force and effect and so long as no Tenant Default exists, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises

during the Term of the Lease without disturbance by Landlord or by any person claiming by, through or under Landlord.

22.    <u>NOTICES.</u>

All notices, waivers, demands, requests or other communications required or permitted hereunder shall, unless otherwise expressly permitted to be oral, be in writing and be deemed to have been properly given, served and received (a) if delivered by messenger, when delivered, (b) if mailed, on the third business day after deposit in the United States mail, certified or registered, postage prepaid, return receipt requested, or (c) if delivered by reputable overnight express courier, freight prepaid, the next business day after delivery to such courier; in every case addressed to the party to be notified as follows:

To Landlord at:

Normal Main, LLC
c/o Tartan Realty Group, Inc.
30 West Monroe Street, Suite 1000
Chicago, Illinois
Attention:  Wilhelm O. Kreuzer

with a copy to:

To Tenant at:

Meatheads Normal, LLC
c/o Meat Heat Management, LLC
30 West Monroe Street, #1000
Chicago, IL 60603
Attention:  Thomas Jednorowicz

with a copy to:

Meatheads Bloomington, LLC
305 North Veteran's Parkway, Suite 107
Bloomington, IL 61704
Attention:  Brian Landstrom

or to such other address(es) or addressee(s) as any party entitled to receive notice hereunder shall designate to the others in the manner provided herein for the service of notices.   Rejection or refusal to accept or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed receipt.

23.   <u>BROKERS</u>.

23.1   <u>Tenant</u>.   Tenant hereby represents and warrants to Landlord that Tenant dealt with no brokers in connection with the Lease other than the Broker(s) identified on the Reference Page.   The Broker(s) shall be compensated by Landlord as provided below.   Tenant shall indemnify, defend and hold harmless the Landlord Indemnitee(s) of, from and against any and all Claims that any Landlord Indemnitee may incur in connection with any claims or demands of any broker or brokers or finders (other than the Broker(s)) for any commission alleged to be due such other broker or brokers or finders claiming to have dealt with Tenant in connection with the Lease.

23.2   <u>Landlord</u>.   Landlord hereby represents and warrants to Tenant that Landlord dealt with no brokers in connection with the Lease other than the Broker(s) identified on the Reference Page.   Landlord hereby agrees to pay all brokerage commissions payable to said Brokers.   Landlord shall indemnify, defend and hold harmless the Tenant Indemnitee(s) of, from and against any and all Claims that any Tenant Indemnitee may incur in connection with any claims or demands of any broker or brokers or finders (including the Broker(s)) for any commission alleged to be due such other broker or brokers or finders claiming to have dealt with Landlord in connection with the Lease.

24.   <u>SUBORDINATION; ESTOPPEL</u>.

24.1   <u>Subordination, Nondisturbance and Attornment</u>.   The Lease shall be subordinate to all existing and future ground leases, mortgages and/or deeds of trust on the Premises, the Project or the Property, and Tenant agrees to subordinate the Lease to any future mortgage or deed of trust and to attorn to Landlord's successor following any foreclosure, sale or transfer in lieu thereof; provided that any such subordination shall be conditioned upon the mortgagee, transferee, purchaser, lessor or beneficiary ("Landlord's Successor") agreeing in writing (in form and substance reasonably satisfactory to Tenant) that so long as no Tenant Default exists hereunder, Tenant's use or possession of the Premises shall not be disturbed, nor shall its obligations be enlarged or its rights be abridged hereunder by reason of any such transaction. Notwithstanding any foreclosure or sale under any mortgage or deed of trust (or transfer by deed in lieu thereof), the Lease shall remain in full force and effect.

24.2   <u>Estoppel Certificate</u>.

(a)   Tenant shall from time to time within fifteen (15) days after a request from Landlord, execute, acknowledge and deliver to any prospective purchaser or mortgagee, or to Landlord on such party's behalf, a statement in writing on Tenant's standard form or on such other form as is reasonably acceptable to Tenant, certifying (i) that the Lease is unmodified and in full force and effect (or if there have been modifications, that the Lease as modified is in full force and effect and identifying the modifications); (ii) the date upon which Tenant began paying rent and the dates to which the rent and other charges have been paid; (iii) that to Tenant's knowledge Landlord is not in default under any provision of the Lease, or, if in default, the nature

thereof in detail; (iv) that there has been no prepayment of rent other than that provided for in the Lease (or stating any prepayments); and (v) such other factual matters as may be reasonably requested by Landlord.

(b)    Landlord shall from time to time within fifteen (15) days after a request from Tenant, execute, acknowledge and deliver to any prospective purchaser or lender, or to Tenant on such party's behalf a statement in writing on Landlord's standard form or on such other form as is reasonably acceptable to Landlord, (i) that the Lease is unmodified and in full force and effect (or if there have been modifications, that the Lease as modified is in full force and effect and identifying the modifications); (ii) the date upon which Tenant began paying rent and the dates to which the rent and other charges have been paid; (iii) that to Landlord's knowledge Tenant is not in default under any provision of the Lease, or, if in default, the nature thereof in detail; (iv) that there has been no prepayment of rent other than that provided for in the Lease (or stating any prepayments); and (v) such other factual matters as may be reasonably requested by Tenant.

25.    GENERAL PROVISIONS.

25.1    Landlord Assignment . The term "Landlord" as used herein shall mean the owner or owners, at the time in question, of the fee title (or a tenant's interest in a ground lease) of the Premises. In the event of an assignment or transfer of the Lease by Landlord for other than security purposes, Landlord shall cause its assignee or transferee to assume the provisions of the Lease accruing after such assignment or transfer and Landlord shall deliver notice of such assignment or transfer and a copy of the effective instrument of transfer to Tenant within fifteen (15) days after the date of transfer. Tenant shall be entitled to continue to pay rent and give all notices to Landlord until Tenant has received the foregoing from Landlord.  In the event of any such assignment or transfer, once or successively, of Landlord's interest in the Project, or any assignment of this Lease by Landlord, and upon such assignee's or transferee's assumption of  the provisions of the Lease accruing after such assignment or transfer, said Landlord making such assignment or transfer shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder accruing after such assignment or transfer, and Tenant agrees to look solely to such assignee or transferee with respect thereto. Landlord shall deliver all funds in which Tenant has an interest to Landlord's purchaser or assignee.

25.2    Severability. The invalidity of any provision of the Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

25.3    Headings. Article and section headings are not a part hereof and shall not be used to interpret the meaning of the Lease.

25.4    Incorporation of Prior Agreements; Amendments. The Lease, including the Reference Page and Exhibits, contains all agreements of the parties as of the date hereof with respect to any matter mentioned herein.   No prior agreement,

correspondence or understanding pertaining to any such matter shall be effective to interpret or modify the terms hereof. The Lease may be modified only in writing, signed by the parties in interest, at the time of the modification. Landlord specifically acknowledges that Tenant's employees at the Premises do not have authority to modify the Lease or to waive, supplement or amend any of Tenant's rights hereunder.

25.5   Waivers.  No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord of the same or any other provision.  A party's consent to or approval of any act shall not be deemed to render unnecessary obtaining such party's consent to or approval of any subsequent act.  No waiver shall be effective unless it is in writing, executed on behalf of Landlord or Tenant by the person to whom notices are to be addressed.

25.6   Cumulative Remedies.  Except where otherwise expressly provided in the Lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

25.7   Binding Effect, Choice of Law.  The Lease shall be binding upon and benefit the parties, their personal representatives, successors and assigns.  The Lease shall be governed by the laws of the state or province where the Premises is located.

25.8   Only Landlord/Tenant Relationship.  Nothing contained in the Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Landlord and Tenant.  Landlord and Tenant expressly agree that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

25.9   Attorneys' Fees.  The non-prevailing party shall pay upon demand all of the reasonable costs, charges and expenses including the court costs and fees and out-of-pocket expenses of counsel, agents and others retained by the prevailing party incurred by the prevailing party in enforcing the terms of the Lease.  A party shall be deemed a "prevailing party" only after all rights of appeal from a favorable adjudication shall have expired or been waived.

25.10   Force Majeure.  Notwithstanding any other provision hereof, in the event that either party shall be delayed or hindered in or prevented from the performance of any agreement, work, service, or other act required under the Lease to be performed by such party, and such delay or hindrance is due to causes entirely beyond its control (excluding financial causes) such as riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty or acts of God, the performance of such agreement, work, service, or other act shall be excused for the period of delay and the time period for performance shall be extended by the same number of days in the period of delay.

25.11  <u>Confidential Lease Information</u>.  Except as may be required by the lawful order of a court or agency of competent jurisdiction, the parties will maintain all Confidential Lease Information in confidence and will not disclose such information to any other party without written consent.   Confidential Lease Information may be released to the parties' respective employees, partners, members, investors, consultants, prospective and actual purchasers, and actual lenders and ground lessors who have a reasonable need for such Confidential Lease Information, provided that such individuals agree to maintain the confidential nature of the information.   This provision shall survive the termination of the Lease.

25.12  <u>Confidential Tenant Information; Financial Statements</u>.  Except as may be required by the lawful order of a court or agency of competent jurisdiction, or except to the extent that Landlord has express authorization from Tenant, Landlord shall keep secret and confidential indefinitely all Confidential Tenant Information and shall not to disclose the same, either directly or indirectly, to any other person, firm, or business entity, or to use it in any way.  This provision shall survive the termination of the Lease.

Tenant shall, within thirty (30) days after receipt of a written request from Landlord, furnish to Landlord Tenant's financial statements for the most recent fiscal year for which they are available, provided that Landlord shall not request said financial statement more than once per lease year.  All such financial information shall be treated as Confidential Tenant Information, except that Landlord may disclose such information to its employees, partners, members, investors, consultants, prospective and actual purchasers, and actual lenders and ground lessors who have a reasonable need for such information upon the condition that the prospective purchaser, prospective or existing lender or underlying lessor shall also covenant to treat such information as confidential.

25.13  <u>Limitation on Landlord's Liability</u>.  The obligations of Landlord under this Lease do not constitute personal obligations of Landlord or its individual partners, members, directors, officers, agents or shareholders, disclosed or undisclosed (except that Tenant may name Landlord as a party defendant in any action brought under this Lease so long as the exercise of any remedy is limited to Landlord's interest in the Premises and the Property), and Tenant's recourse under this Lease shall be limited to Landlord's interest in the Premises and the Property for satisfaction of any liability under or in respect of this Lease or for the satisfaction of Tenant's remedies for the collection of a judgment (or other legal process) requiring the payment of money by Landlord, and no other property and assets of Landlord or any of its partner, member, officer, director, agent, or shareholder, disclosed or undisclosed, other than the Premises, Project and Property, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or in respect of this Lease, the relationship of Landlord and Tenant under this Lease, or Tenant's use of the land, buildings or any other part of the Project or the use and occupancy of the Premises.

26.   <u>SALES TAX REPORTING.</u>

Tenant agrees to: (i) complete, execute and deliver to the Illinois Department of Revenue or any successor department or agency thereof (the "Department") the form, which is entitled "Authorization to Release Sales Tax Information" and attached hereto as Exhibit H ("Release Form"), for the period beginning on the Rent Commencement Date and ending when the Lease terminates; (ii) if the Release Form is delivered to the Department but the Department does not provide the Town of Normal (the "Town") on a monthly basis the amount of Sales Taxes (hereafter defined) collected by the Department, to furnish to the Town concurrent with the filing of any and all sales reports with the Department, copies of its sales tax returns, sales tax reports, amendments, proof of payment, or any other sales tax information filed with the Department, all of which documents will be solely regarding the Premises; and (iii) if required by the Department, to furnish to the Department a letter signed by an officer of Tenant authorizing the Department to release to the Director for each calendar month, all information relating to Sales Taxes generated on the Premises. For purposes of this Lease, the term "Sales Taxes" means the taxes imposed by the State of Illinois (the "State") as a retailers' occupation tax or retailers' service occupation tax, or any other sales tax or successor tax that may be enacted by the State or the Town as a replacement thereto, that are generated by retail sales on the Project Center and adjacent land thereto and distributed to the Town. Notwithstanding the foregoing to the contrary, in no event shall Tenant be required to submit Tenant's financial statement(s).

27.    PREVAILING WAGES.

Tenant acknowledges that Landlord is utilizing union workers and/or utilizing works and paying them prevailing wages to construct the Premises and other improvements for other tenants in other buildings of the Project ("Landlord's Construction"), and Landlord acknowledges that Tenant may use non-union workers for the construction of all or any portion of Tenant's initial improvements to the Premises ("Tenant's Work"). Tenant agrees that it will use commercially reasonable efforts not to cause (whether by workers performing Tenant's Work or Landlord's Construction) any strike, picketing, boycott, strife, slowdown, delay or disruption (each of the foregoing a "Disruption") of or to Tenant's Work and/or Landlord's Construction. If any Disruption occurs, Tenant shall, without notice from Landlord and without any cure period, immediately take whatever commercially reasonable actions are appropriate to eliminate each Disruption.

*    *    *    *    *

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed the Lease as of the date first above written.

LANDLORD:

TENANT:

NORMAL MAIN, LLC,
an Illinois limited liability company

MEATHEAD NORMAL LLC,
an Illinois limited liability company

By: _____
Its Authorized Signatory

By:  Meathead Management, LLC, its member

By:  Jed Reich Investments, LLC, its Manager

By: _____
Tom Jednorowicz, its Manager

EXHIBIT A

LEGAL DESCRIPTION

Address:      701 South Main Street

### 701 South Main Legal Description

Tract No. 1:
Lot 42 of the Normal Town Survey of 1898 of the South Half of Section 28, Township 24 North,
Range 2 East of the Third Principal Meridian, in McLean County, Illinois.

Tract No. 2:
The East Half of the East 110 feet of Lot 23 in Assessor's Subdivision of the South Half of
Section 28, Township 24 North, Range 2 East of the Third Principal Meridian, Except 2 Rods off
the North Side used for road, in McLean County, Illinois.

Tract No. 3: (Transfer Parcel from west to east)
A part of Lot 23 in Assessor's Subdivision of the South Half of Section 28, Township 24 North,
Range 2 East of the Third Principal Meridian as recorded in Plat Book 2, page 149, described
as follows:
Beginning at the intersection of the East Line of the West Half of the East 110 feet of said Lot 23
with the South Line of the North 33 feet of said Lot 23. From said Point of Beginning, thence
west 166.20 feet along said South Line to a point on the East Line of the West 33 feet of said
Lot 23; thence south 132.00 feet along said East Line which forms an angle to the right of 90°-
27'-30" with the last described course to a point on the South Line of said Lot 23; thence east
167.46 feet along said South Line which forms an angle to the right of 89°-32'-30" with the last
described course to a point on said East Line of the West Half of the East 110 feet of Lot 23;
thence north 132.00 feet along said East Line which forms an angle to the right of 89°-54'-47"
with the last described course to the Point of Beginning, in McLean County, Illinois,
Excepting therefrom the following described parcel:

Beginning at the intersection of the South Line of the North 33 feet of Lot 23 in Assessor's
Subdivision of the South Half of Section 28, Township 24 North, Range 2 East of the Third
Principal Meridian as recorded in Plat Book 2, page 149 with the East Line of the West 33 feet
of said Lot 23; thence east along the South Line of said North 33 feet 91.48 feet; thence south
132.00 feet along a line which forms an angle to the left of 90°-00'-00" with the last described
course to a point on the South Line of said Lot 23; thence west 92.54 feet along the South Line
of said Lot 23 which forms an angle to the left of 90°-00'-00" with the last described course to a
point in the East Line of said West 33 feet; thence north 132.00 feet along the East Line of the
West 33 feet of said Lot 23 which forms an angle to the left of 89°-32'-30" with the last described
course to the Point of Beginning, in McLean County, Illinois.



SITE PLAN

EXHIBIT B

Normal Man, LLC & 6taut Maude Leٔ٥ٔ٥٥



EXHIBIT C

CERTAIN DEFINITIONS

"Claims" means any and all injuries, costs, expenses (including reasonable attorneys' fees and expenses), liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature.

"Common Areas" means all portions of the Project (excluding the Premises, Residential Portion of the Project and any other space in the Project designed to be leased to another tenant for its exclusive use) including, without limitation, parking areas, loading areas, landscaped areas, and sidewalks.

"Confidential Lease Information" means and includes the terms of any letter of intent regarding the Lease, the Lease, and any and all information whether in oral, written, or other form, which is communicated to Landlord relating to Tenant's proposed improvement of the Premises, including but not limited to architectural plans, specifications, site plans, and drawings (regardless of whether such information is labeled confidential).

"Confidential Tenant Information" means all of Tenant's meal preparation techniques, pricing information, pricing strategies, supplier information, training methods, customer surveys, marketing plans, advertising and promotion methods and plans, business plans, menus, recipes, methods of food preparation, product formulae, methods and standards, data and data bases, research, operational information, management information, financial information, marketing information, tax information, demographic information, equipment specifications and all other confidential, non-public information, trade secrets, customer records and other customer information of or concerning Tenant and Tenant Affiliates. Confidential Tenant Information shall not include information which is or becomes publicly known through no wrongful act of Landlord, but shall include compilations of such information where the coordination, selection or arrangement of such information is not publicly known or available.

"Environmental Law" means any federal, state, provincial, or local law, statute, ordinance, regulation or order and all amendments thereto pertaining to health, industrial hygiene, environmental conditions or Hazardous Substances.

"Floor Area" means the square footage of a space determined by measuring from the outside of any exterior walls to the center of any interior demising walls.

"Hazardous Substance" means any hazardous or toxic substances, materials or wastes, or pollutants or contaminants as defined, listed or regulated by any Environmental Law or by common law decision including, without limitation, chlorinated solvents; petroleum products or by-products; asbestos; and polychlorinated biphenyl.

"Landlord Indemnitee(s)" means Landlord and Landlord's agents, officers, directors, members, partners, employees, and contractors.

"Operating Expenses" means the reasonable and necessary, out-of-pocket costs and expenses actually paid by Landlord in any calendar year directly attributable to maintaining, operating, and providing services to and for the Project and the Common Areas, including the costs of utilities, maintenance, insurance, supplies and wages and, to the extent provided by Landlord and not billed separately, the cost of water, gas, electricity and HVAC to the Premises and other premises. Operating Expenses shall not include: (1) the initial costs of equipment properly chargeable to a capital account using generally accepted accounting principles consistently applied or the original costs of constructing the Project; (2) the cost of any capital addition or replacement to the Project or the Property (or reserves therefor); (3) expenses for which the Landlord is or is entitled to be reimbursed by another source (excluding tenant reimbursements for Operating Expenses), including but not limited to repair or replacement of any item covered by warranty or insurance; (4) costs incurred to benefit (or as a result of) a specific tenant or items and services selectively supplied to any specific tenant; (5) expenses for the defense of the Landlord's title to the Property; (6) structural repairs and replacements; (7) depreciation and amortization of the Project or financing costs, including interest and principal amortization of debts; (8) charitable or political contributions; (9) costs of improving or renovating space for a tenant or space vacated by a tenant; (10) any amounts expended by Landlord to comply with any Environmental Laws; (11) costs to correct original or latent defects in the design, construction or equipment of the Project; (12) expenses paid directly by any tenant for any reason (such as excessive utility use); (13) any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty or hazard; (14) any expenses incurred (a) to comply with any governmental regulations and rules or any court order, decree or judgment including, without limitation, the Americans with Disabilities Act; or (b) as a result of Landlord's alleged violation of or failure to comply with any governmental regulations and rules or any court order, decree or judgment; (15) leasing commissions, advertising expenses and other costs incurred in leasing or procuring new tenants; (16) rental on ground leases or other underlying leases; (17) attorneys' fees, accounting fees and expenditures incurred in connection with disputes and claims of other tenants or occupants of the Project or with other third parties excluding Real Estate Tax contests; (18) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Project; and (19) amounts billed (directly or indirectly) for salaries, overhead and administrative and/or management fees, office expenses, rent and office supplies which (a) in the aggregate, exceed ten percent (10%) of the total cost of the Operating Expenses; (b) are duplicative; or (c) do not represent costs incurred for actual services.

"Pass-Through Rent" means Tenant's Pro Rata Share of Operating Expenses, Landlord's Insurance Expenses and Real Estate Taxes.

"Real Estate Taxes" means general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest in the Property, together with Landlord's reasonable out-of-pocket costs (including reasonable attorneys' fees) to contest such Real Estate Taxes. Real Estate Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any income taxes arising out of or

C-2

related to ownership and operation of income producing real estate, unless such taxes are substituted for ad valorem real estate taxes; (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it; or (d) assessments for improvements completed prior to the Turnover Date. Assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Estate Taxes for any Lease Year.

"Remediation Costs" means any and all costs of repair and remediation required as a result of the violation of Environmental Laws or breach of an agreement of the Lease regarding Hazardous Substances.

"Tenant Affiliate" means (i) any entity controlling, controlled by or under common control with Tenant or a controlling owner of Tenant; (ii) any entity resulting from the merger, consolidation or reorganization of Tenant or an owner of Tenant into or with any other entity; or (iii) any entity acquiring all or substantially all of the ownership of Tenant or all or substantially all of Tenant's assets.

"Tenant Indemnitee(s)" means Tenant and Tenant's agents, officers, directors, members, partners, employees, and contractors.

"Tenant Delay" means shall mean: (i) any delay incurred by Landlord in performing Landlord's Work as a result of the action or inaction of Tenant, its employees, agents, and contractors, including, but not limited to, any delay in Tenant's completion or submission to Landlord of the Plans for the Initial Improvements, and (ii) any delay resulting from "change orders" of Tenant pertaining to Landlord's Work. Landlord may withhold its consent to a change order in Landlord's sole discretion.

EXHIBIT D

LANDLORD'S WORK

**Landlord shall provide the following at Landlord's expense prior to Tenant taking possession of premises:**

1. Floor – Compacted stone subbase fully prepared for Tenant supplied mesh and concrete. Landlord will provide Tenant an additional $8/square foot for concrete.

2. Walls - Perimeter and demising walls shall be constructed of 5/8" Type "X" G.W.B. sheetrock and insulated according to code, dry walled, taped and sanded (ready for paint) full height to underside of slab or roof deck. Sound levels from adjacent spaces shall be minimized by sealants and insulation. Seal top joint tight with foam sealant unless otherwise required for fire protection. All demising walls and sealants to meet highest applicable code fire rating.

3. HVAC - One ton of HVAC per 125 SF of premises. System shall be divided into two or three zones and will include make-up air unit per Tenant's specs. No unit shall be more than 7.5 tons each. HVAC unit locations are to be specified by tenant. Provide and transfer all warranties to tenant. System to include smoke detectors, fire alarms and building connections as required by applicable code, manufacturer's specifications and building requirements. The compressors shall have no less than a five-year warranty and the remaining system components shall have no less than a twelve-month warranty. Landlord to provide gas units and proper connections whenever possible for energy efficiencies. All roof top equipment will be properly screened to meet applicable covenants, codes, and ordinances. Landlord will supply properly flashed, black iron exhaust through roof at Tenant specified location.

4. Gas - Minimum 2 ½ " gas service with meter, stubbed to space as per tenant's specified location supplying 1,622 MBH sized at 2LB pressure with a 1 ½ allowable pressure drop. Service shall be exclusive of any mechanical systems.

5. Sewer - Minimum 4" sanitary waste line stubbed to premises as per tenant's specified location, set at appropriate elevation to allow tenant's plumbing to meet all applicable codes. Grease trap adequate to service Tenant's business and to satisfy local codes. Supply minimum 4" properly flashed vent through roof to restroom area per Tenant's plans.

6. Water - 2 " diameter water line stubbed to premises with a minimum of 60 PSI static pressure with separate meter, backflow device, and shut off valve rated for 200 PSI located per Tenant's specified location and plans.

7. Fire Protection – Fire sprinkler protection system including flow and tamper device as required by applicable building codes per tenant's specified locations. Sprinkler coverage (drops and heads) distributed throughout premises per Tenant's plans and code. Landlord to provide finalized shell permit for entire system. Provide smoke detectors, fire alarms and building connections as required by applicable codes, manufacturer's specifications and building requirements.

8. Fire Alarm - Fire alarm monitoring system including all sensors, strobes, horns and pull stations per Tenant's plans and sensors as required for the Premises, connected to building monitoring system and Tenant's equipment as required by building system requirements, code and all government agencies.

9. Electrical Service - 400 amp 120/208 volt 3 phase, 4 wire underground electrical service with one dedicated meter as per tenant's specified locations. Landlord to provide wire and conduit from service point into premises connected to two (2) or three (3) lockable 200 amp recessed mounted panels with no less than 42 circuits in one location designated by Tenant. Landlord to provide temporary power to the premises sufficient to serve Tenant's construction until completion of Tenant's build out.

10. Telephone - 1" conduit for telephone service with pull strings, stubbed to space as per tenant's specified location from property's joint telephone demarcation/space.

11. Storefront - Storefront glazing to be clear (non-tint), thermal insulated, and safety rated. Front entrance to be at street or walkway level and in compliance with all applicable codes that meet federal, state, provincial, and local building, life safety, and handicap accessibility codes.

D-1

12. **Rear Door** – 3'-6" x 7' hollow metal door with peephole, panic hardware requirements and weather stripping per code.

13. **Roof** – Roof will be insulated to meet local codes. Tenant will be provided with adequate access to the roof. Roof will be structurally engineered to accommodate Tenant's HVAC units, make up air units, exhaust hoods, vents, ducts, and fans.

14. **Demolition** – Demolish, remove, and legally discard of all prior tenant's improvements including, but not limited to: hazardous substances, partitions, ceilings, floor coverings including adhesive and grout, electrical conduit, plumbing, mechanical ductwork, and other fixtures and equipment. Tenant reserves the right to identify real and personal property items to remain prior to demolition. Space shall be left in a broom clean condition.

15. **Warranties** - Warranties for all improvements including but not limited to mechanical, electrical and plumbing systems for a period of at least one year (or longer if required by lease). All warranties shall be assigned and provided to tenant.

16. **Handicap Accessibility** - All municipal state and federal ADA requirements to be installed by Landlord. All means of ingress/egress shall be at street entry grade level. Handicap accessible lift or ramp must be approved by Tenant and installed per Federal handicap code with applicable landings, railings and clearances.

17. **Dumpster Area** – Landlord will provide a sufficient area, convenient to Tenant's space, for trash dumpster, recycling containers and grease receptacle.

Warranties for all improvements including but not limited to mechanical, electrical and plumbing systems for a period of at least one year (or longer if required by lease). All warranties will be assigned and provided to Meat Heads.

Landlord's contractor at Landlord's expense shall do all required roof penetrations. If, notwithstanding the preceding sentence, Tenant is required to perform such roof penetrations, Landlord hereby agrees: (a) unless objected to by Landlord within thirty (30) days of completion of the penetration, Tenant's work shall be deemed proper; (b) Tenant performance of such roof penetration shall not reduce Landlord's obligation to maintain water tight roof and (c) Landlord agrees to indemnify, defend and hold harmless from and against all claims, causes of action, liabilities, losses, damages, and expense whatsoever (including attorney's fees) caused by or arising as a result of such penetration.

EXHIBIT E

DELIVERY OF POSSESSION

Store: 701 South Main Street, Normal, Illinois

Tenant: Meathead Normal, LLC

Landlord: Normal Main, LLC

Premises Address: 701 South Main Street, Normal, Illinois

Square Footage: 2,635

Landlord and Tenant acknowledge and agree to the following:

Floor Area is 2,635 square feet

Prorata Share is 34.79%

Turnover Date is July 1, 2011

Rent Commencement Date is August 22, 2011

Expiration Date is August 31, 2021

Renewal Option #1 needs to be exercised by March 4, 2021

Renewal Option #2 needs to be exercised by March 26, 2026

Choose one:

- Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

- Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

Tenant hereby identifies the items of Landlord's Work indicated below are not complete: ___

_____

_____ [Attach additional pages if needed]

* * * * *

[Signature Page Follows]

Normal Main, LLC & Meat Heads Lease

E-1

LANDLORD:

TENANT:

NORMAL MAIN, LLC,
an Illinois limited liability company

MEATHEAD NORMAL, LLC,
an Illinois limited liability company

By: _____
Its Authorized Signatory

By:  Meathead Management, LLC, its
member

By:  Jed Reich Investments, LLC, its
Manager

By: _____
Tom Jednorowicz, its Manager

Date: 9/7/2011

Date: 9·12·11

EXHIBIT E

DELIVERY OF POSSESSION

Store:  701 South Main Street, Normal, Illinois

Tenant:                        Meathead Normal, LLC

Landlord:                     Normal Main, LLC

Premises Address:        701 South Main Street, Normal, Illinois

Square Footage:          2,635

Landlord and Tenant acknowledge and agree to the following:

Floor Area is _____ square feet

Prorata Share is _____

Turnover Date is _____

Rent Commencement Date is _____

Expiration Date is _____

Renewal Option #1 needs to be exercised by _____

Renewal Option #2 needs to be exercised by _____

Choose one:

- Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

- Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

Tenant hereby identifies the items of Landlord's Work indicated below are not complete:
_____
_____
_____[Attach additional pages if needed]

*       *       *       *       *

[Signature Page Follows]

Normal Main, LLC & Meat Heads Lease                    E-1

LANDLORD:

NORMAL MAIN, LLC,
an Illinois limited liability company

By:_____
        Its Authorized Signatory

TENANT:

MEATHEAD NORMA, LLC,
an Illinois limited liability company

By:  Meathead Management, LLC, its
member

By:  Jed Reich Investments, LLC, its
Manager

By: _____
        Tom Jednorowicz, its Manager

Date:_____

Date:_____

# EXHIBIT F

## SIGNAGE, PRELIMINARY PLANS, PRE-OPENING SIGNAGE, TRADE DRESS AND EXTERIOR ELEVATION

## EXHIBIT G

## RESTRICTIONS ON USE

[Provisions may be quoted verbatim; if so, references to other exhibits or sections shall be deemed to incorporate those exhibits/sections of the relevant leases or other agreements and capitalized terms shall have the respective meanings ascribed in the lease or other agreement containing the exclusive/use restrictions]

1. **Chipotle**

   Exclusive Use:     The sale of burritos, wraps, fajitas or tacos.

   Permitted Use:     A "Chipotle" restaurant serving specialty burritos and tacos, and other items generally served in a "Chipotle" restaurant including, at Tenant's option, alcoholic beverages, and in the event of a change in use, for any other lawful retail purpose not conflicting with any then existing exclusive or prohibited use granted by Landlord to any other tenant at the Property.

2. **ATM**

   Owner agrees that, during the term of this Lease, no portion of the Tract, other than that portion leased to Bank herein, shall be used for the installation or operation of any ATM or any other electronic banking delivery system, except for any such ATM's or electronic banking systems which may already be in place, and except for any ATM's which may be located in the interior of any building or store located on the Tract; so long as there is no advertisement for such ATMs on the exterior of such buildings or stores.

## EXHIBIT H

## SALES TAX REPORT

### AUTHORIZATION TO RELEASE SALES TAX INFORMATION

The undersigned Taxpayer hereby authorizes the Illinois Department of Revenue ("IDOR") to disclose to the designated city, town, village or county the amount of the local government's share of sales tax received on behalf of the taxpayer.  Reporting for a period beginning with tax collected by the department during _____, _____ and
(Beginning Month/Year)

ending with tax collected by the department in _____, _____.
(Ending Month/Year)

This information is to be released to the village, city, town or county of _____, attn: Clerk, Treasurer, Finance Officer, Comptroller, etc.

BUSINESS INFORMATION:

_____
(Illinois Business Tax Number)

_____
(Taxpayer/Business Name)

_____
(Address)

_____
(City, Town, Village or County)

TAXPAYER: The undersigned is an owner/authorized officer of this business.

By:_____
(Signature)

_____
(Print Name)

_____
(Title)

_____
(Telephone Number)

Note:  All requests must have a beginning and ending date. Incomplete request will be returned to the local government.

Normal Main, LLC & Meat Heads Lease

## EXHIBIT A

## LEGAL DESCRIPTION

Address:    701 South Main Street

## **701 South Main Legal Description**

Tract No. 1:
Lot 42 of the Normal Town Survey of 1898 of the South Half of Section 28, Township 24 North, Range 2 East of the Third Principal Meridian, in McLean County, Illinois.

Tract No. 2:
The East Half of the East 110 feet of Lot 23 in Assessor's Subdivision of the South Half of Section 28, Township 24 North, Range 2 East of the Third Principal Meridian, Except 2 Rods off the North Side used for road, in McLean County, Illinois.

Tract No. 3: (Transfer Parcel from west to east)
A part of Lot 23 in Assessor's Subdivision of the South Half of Section 28, Township 24 North, Range 2 East of the Third Principal Meridian as recorded in Plat Book 2, page 149, described as follows:
Beginning at the intersection of the East Line of the West Half of the East 110 feet of said Lot 23 with the South Line of the North 33 feet of said Lot 23. From said Point of Beginning, thence west 166.20 feet along said South Line to a point on the East Line of the West 33 feet of said Lot 23; thence south 132.00 feet along said East Line which forms an angle to the right of 90°-27'-30" with the last described course to a point on the South Line of said Lot 23; thence east 167.46 feet along said South Line which forms an angle to the right of 89°-32'-30" with the last described course to a point on said East Line of the West Half of the East 110 feet of Lot 23; thence north 132.00 feet along said East Line which forms an angle to the right of 89°-54'-47" with the last described course to the Point of Beginning, in McLean County, Illinois, Excepting therefrom the following described parcel:

Beginning at the intersection of the South Line of the North 33 feet of Lot 23 in Assessor's Subdivision of the South Half of Section 28, Township 24 North, Range 2 East of the Third Principal Meridian as recorded in Plat Book 2, page 149 with the East Line of the West 33 feet of said Lot 23; thence east along the South Line of said North 33 feet 91.48 feet; thence south 132.00 feet along a line which forms an angle to the left of 90°-00'-00" with the last described course to a point on the South Line of said Lot 23; thence west 92.54 feet along the South Line of said Lot 23 which forms an angle to the left of 90°-00'-00" with the last described course to a point in the East Line of said West 33 feet; thence north 132.00 feet along the East Line of the West 33 feet of said Lot 23 which forms an angle to the left of 89°-32'-30" with the last described course to the Point of Beginning, in McLean County, Illinois.

EXHIBIT B

SITE PLAN





EXHIBIT C

CERTAIN DEFINITIONS

"Claims" means any and all injuries, costs, expenses (including reasonable attorneys' fees and expenses), liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature.

"Common Areas" means all portions of the Project (excluding the Premises, Residential Portion of the Project and any other space in the Project designed to be leased to another tenant for its exclusive use) including, without limitation, parking areas, loading areas, landscaped areas, and sidewalks.

"Confidential Lease Information" means and includes the terms of any letter of intent regarding the Lease, the Lease, and any and all information whether in oral, written, or other form, which is communicated to Landlord relating to Tenant's proposed improvement of the Premises, including but not limited to architectural plans, specifications, site plans, and drawings (regardless of whether such information is labeled confidential).

"Confidential Tenant Information" means all of Tenant's meal preparation techniques, pricing information, pricing strategies, supplier information, training methods, customer surveys, marketing plans, advertising and promotion methods and plans, business plans, menus, recipes, methods of food preparation, product formulae, methods and standards, data and data bases, research, operational information, management information, financial information, marketing information, tax information, demographic information, equipment specifications and all other confidential, non-public information, trade secrets, customer records and other customer information of or concerning Tenant and Tenant Affiliates.  Confidential Tenant Information shall not include information which is or becomes publicly known through no wrongful act of Landlord, but shall include compilations of such information where the coordination, selection or arrangement of such information is not publicly known or available.

"Environmental Law" means any federal, state, provincial, or local law, statute, ordinance, regulation or order and all amendments thereto pertaining to health, industrial hygiene, environmental conditions or Hazardous Substances.

"Floor Area" means the square footage of a space determined by measuring from the outside of any exterior walls to the center of any interior demising walls.

"Hazardous Substance" means any hazardous or toxic substances, materials or wastes, or pollutants or contaminants as defined, listed or regulated by any Environmental Law or by common law decision including, without limitation, chlorinated solvents; petroleum products or by-products; asbestos; and polychlorinated biphenyl.

"Landlord Indemnitee(s)" means Landlord and Landlord's agents, officers, directors, members, partners, employees, and contractors.

"Operating Expenses" means the reasonable and necessary, out-of-pocket costs and expenses actually paid by Landlord in any calendar year directly attributable to maintaining, operating, and providing services to and for the Project and the Common Areas, including the costs of utilities, maintenance, insurance, supplies and wages and, to the extent provided by Landlord and not billed separately, the cost of water, gas, electricity and HVAC to the Premises and other premises.  Operating Expenses shall not include:  (1) the initial costs of equipment properly chargeable to a capital account using generally accepted accounting principles consistently applied or the original costs of constructing the Project; (2) the cost of any capital addition or replacement to the Project or the Property (or reserves therefor); (3) expenses for which the Landlord is or is entitled to be reimbursed by another source (excluding tenant reimbursements for Operating Expenses), including but not limited to repair or replacement of any item covered by warranty or insurance; (4) costs incurred to benefit (or as a result of) a specific tenant or items and services selectively supplied to any specific tenant; (5) expenses for the defense of the Landlord's title to the Property; (6) structural repairs and replacements; (7) depreciation and amortization of the Project or financing costs, including interest and principal amortization of debts; (8) charitable or political contributions; (9) costs of improving or renovating space for a tenant or space vacated by a tenant; (10) any amounts expended by Landlord to comply with any Environmental Laws; (11) costs to correct original or latent defects in the design, construction or equipment of the Project; (12) expenses paid directly by any tenant for any reason (such as excessive utility use); (13) any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty or hazard; (14) any expenses incurred (a) to comply with any governmental regulations and rules or any court order, decree or judgment including, without limitation, the Americans with Disabilities Act; or (b) as a result of Landlord's alleged violation of or failure to comply with any governmental regulations and rules or any court order, decree or judgment; (15) leasing commissions, advertising expenses and other costs incurred in leasing or procuring new tenants; (16) rental on ground leases or other underlying leases; (17) attorneys' fees, accounting fees and expenditures incurred in connection with disputes and claims of other tenants or occupants of the Project or with other third parties excluding Real Estate Tax contests; (18) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Project; and (19) amounts billed (directly or indirectly) for salaries, overhead and administrative and/or management fees, office expenses, rent and office supplies which (a) in the aggregate, exceed ten percent (10%) of the total cost of the Operating Expenses; (b) are duplicative; or (c) do not represent costs incurred for actual services.

"Pass-Through Rent" means Tenant's Pro Rata Share of Operating Expenses, Landlord's Insurance Expenses and Real Estate Taxes.

"Real Estate Taxes" means general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest in the Property, together with Landlord's reasonable out-of-pocket costs (including reasonable attorneys' fees) to contest such Real Estate Taxes.  Real Estate Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any income taxes arising out of or

C-2

related to ownership and operation of income producing real estate, unless such taxes are substituted for ad valorem real estate taxes; (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it; or (d) assessments for improvements completed prior to the Turnover Date. Assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Estate Taxes for any Lease Year.

"Remediation Costs" means any and all costs of repair and remediation required as a result of the violation of Environmental Laws or breach of an agreement of the Lease regarding Hazardous Substances.

"Tenant Affiliate" means (i) any entity controlling, controlled by or under common control with Tenant or a controlling owner of Tenant; (ii) any entity resulting from the merger, consolidation or reorganization of Tenant or an owner of Tenant into or with any other entity; or (iii) any entity acquiring all or substantially all of the ownership of Tenant or all or substantially all of Tenant's assets.

"Tenant Indemnitee(s)" means Tenant and Tenant's agents, officers, directors, members, partners, employees, and contractors.

"Tenant Delay" means shall mean: (i) any delay incurred by Landlord in performing Landlord's Work as a result of the action or inaction of Tenant, its employees, agents, and contractors, including, but not limited to, any delay in Tenant's completion or submission to Landlord of the Plans for the Initial Improvements, and (ii) any delay resulting from "change orders" of Tenant pertaining to Landlord's Work. Landlord may withhold its consent to a change order in Landlord's sole discretion.

## EXHIBIT D

## LANDLORD'S WORK

**Landlord shall provide the following at Landlord's expense prior to Tenant taking possession of premises:**

1. **Floor** – Compacted stone subbase fully prepared for Tenant supplied mesh and concrete. Landlord will provide Tenant an additional $8/square foot for concrete.

2. **Walls** - Perimeter and demising walls shall be constructed of 5/8" Type "X" G.W.B. sheetrock and insulated according to code, dry walled, taped and sanded (ready for paint) full height to underside of slab or roof deck. Sound levels from adjacent spaces shall be minimized by sealants and insulation. Seal top joint tight with foam sealant unless otherwise required for fire protection. All demising walls and sealants to meet highest applicable code fire rating.

3. **HVAC** - One ton of HVAC per 125 SF of premises. System shall be divided into two or three zones and will include make-up air unit per Tenant's specs. No unit shall be more than 7.5 tons each. HVAC unit locations are to be specified by tenant. Provide and transfer all warranties to tenant. System to include smoke detectors, fire alarms and building connections as required by applicable code, manufacturer's specifications and building requirements. The compressors shall have no less than a five-year warranty and the remaining system components shall have no less than a twelve-month warranty. Landlord to provide gas units and proper connections whenever possible for energy efficiencies. All roof top equipment will be properly screened to meet applicable covenants, codes, and ordinances. Landlord will supply properly flashed, black iron exhaust through roof at Tenant specified location.

4. **Gas** - Minimum 2 ½ " gas service with meter, stubbed to space as per tenant's specified location supplying 1,622 MBH sized at 2LB pressure with a 1 ½ allowable pressure drop. Service shall be exclusive of any mechanical systems.

5. **Sewer** - Minimum 4" sanitary waste line stubbed to premises as per tenant's specified location, set at appropriate elevation to allow tenant's plumbing to meet all applicable codes. Grease trap adequate to service Tenant's business and to satisfy local codes. Supply minimum 4" properly flashed vent through roof to restroom area per Tenant's plans.

6. **Water** - 2 " diameter water line stubbed to premises with a minimum of 60 PSI static pressure with separate meter, backflow device, and shut off valve rated for 200 PSI located per Tenant's specified location and plans.

7. **Fire Protection** – Fire sprinkler protection system including flow and tamper device as required by applicable building codes per tenant's specified locations. Sprinkler coverage (drops and heads) distributed throughout premises per Tenant's plans and code. Landlord to provide finalized shell permit for entire system. Provide smoke detectors, fire alarms and building connections as required by applicable codes, manufacturer's specifications and building requirements.

8. **Fire Alarm** - Fire alarm monitoring system including all sensors, strobes, horns and pull stations per Tenant's plans and sensors as required for the Premises, connected to building monitoring system and Tenant's equipment as required by building system requirements, code and all government agencies.

9. **Electrical Service** - 400 amp 120/208 volt 3 phase, 4 wire underground electrical service with one dedicated meter as per tenant's specified locations. Landlord to provide wire and conduit from service point into premises connected to two (2) or three (3) lockable 200 amp recessed mounted panels with no less than 42 circuits in one location designated by Tenant. Landlord to provide temporary power to the premises sufficient to serve Tenant's construction until completion of Tenant's build out.

10. **Telephone** - 1" conduit for telephone service with pull strings, stubbed to space as per tenant's specified location from property's joint telephone demarcation/space.

11. **Storefront** - Storefront glazing to be clear (non-tint), thermal insulated, and safety rated. Front entrance to be at street or walkway level and in compliance with all applicable codes that meet federal, state, provincial, and local building, life safety, and handicap accessibility codes.

12. **Rear Door** – 3'-6" x 7' hollow metal door with peephole, panic hardware requirements and weather stripping per code.

13. **Roof** – Roof will be insulated to meet local codes. Tenant will be provided with adequate access to the roof. Roof will be structurally engineered to accommodate Tenant's HVAC units, make up air units, exhaust hoods, vents, ducts, and fans.

14. **Demolition** – Demolish, remove, and legally discard of all prior tenant's improvements including, but not limited to: hazardous substances, partitions, ceilings, floor coverings including adhesive and grout, electrical conduit, plumbing, mechanical ductwork, and other fixtures and equipment. Tenant reserves the right to identify real and personal property items to remain prior to demolition. Space shall be left in a broom clean condition.

15. **Warranties** - Warranties for all improvements including but not limited to mechanical, electrical and plumbing systems for a period of at least one year (or longer if required by lease). All warranties shall be assigned and provided to tenant.

16. **Handicap Accessibility** - All municipal state and federal ADA requirements to be installed by Landlord. All means of ingress/egress shall be at street entry grade level. Handicap accessible lift or ramp must be approved by Tenant and installed per Federal handicap code with applicable landings, railings and clearances.

17. **Dumpster Area** – Landlord will provide a sufficient area, convenient to Tenant's space, for trash dumpster, recycling containers and grease receptacle.

Warranties for all improvements including but not limited to mechanical, electrical and plumbing systems for a period of at least one year (or longer if required by lease). All warranties will be assigned and provided to Meat Heads.

Landlord's contractor at Landlord's expense shall do all required roof penetrations. If, notwithstanding the preceding sentence, Tenant is required to perform such roof penetrations, Landlord hereby agrees: (a) unless objected to by Landlord within thirty (30) days of completion of the penetration, Tenant's work shall be deemed proper; (b) Tenant performance of such roof penetration shall not reduce Landlord's obligation to maintain water tight roof' and (c) Landlord agrees to indemnify, defend and hold harmless from and against all claims, causes of action, liabilities, losses, damages, and expense whatsoever (including attorney's fees) caused by or arising as a result of such penetration.

EXHIBIT E

DELIVERY OF POSSESSION

Store:  701 South Main Street, Normal, Illinois

Tenant:                              Meathead Normal, LLC

Landlord:                           Normal Main, LLC

Premises Address:              701 South Main Street, Normal, Illinois

Square Footage:               2,635

Landlord and Tenant acknowledge and agree to the following:

Floor Area is _____ square feet

Prorata Share is _____

Turnover Date is _____

Rent Commencement Date is _____

Expiration Date is _____

Renewal Option #1 needs to be exercised by _____

Renewal Option #2 needs to be exercised by _____

Choose one:

- Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

- Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

Tenant hereby identifies the items of Landlord's Work indicated below are not complete:

_____

_____

_____ [Attach additional pages if needed]

*       *       *       *       *

[Signature Page Follows]

LANDLORD:

NORMAL MAIN, LLC,
an Illinois limited liability company

By:_____
     Its Authorized Signatory

TENANT:

MEATHEAD NORMAL, LLC,
an Illinois limited liability company

By:  Meathead Management, LLC, its
member

By:  Jed Reich Investments, LLC, its
Manager

By: _____
     Tom Jednorowicz, its Manager

Date:_____

Date:_____

EXHIBIT E

DELIVERY OF POSSESSION

Store:  701 South Main Street, Normal, Illinois

Tenant:                           Meathead Normal, LLC

Landlord:                        Normal Main, LLC

Premises Address:          701 South Main Street, Normal, Illinois

Square Footage:              2,635

Landlord and Tenant acknowledge and agree to the following:

Floor Area is 2,635 square feet

Prorata Share is 34.79%

Turnover Date is July 1, 2011

Rent Commencement Date is August 22, 2011

Expiration Date is August 31, 2021

Renewal Option #1 needs to be exercised by March 4, 2021

Renewal Option #2 needs to be exercised by March 26, 2026

Choose one:

- Landlord's Work is complete and accepted by Tenant, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items.

- Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease.

Tenant hereby identifies the items of Landlord's Work indicated below are not complete:

_____

_____  [Attach additional pages if needed]

*       *       *       *       *

[Signature Page Follows]

LANDLORD:

TENANT:

NORMAL MAIN, LLC,
an Illinois limited liability company

MEATHEAD NORMAL, LLC,
an Illinois limited liability company

By: _____
Its Authorized Signatory

By:  Meathead Management, LLC, its
member

By:  Jed Reich Investments, LLC, its
Manager

By: _____
Tom Jednorowicz, its Manager

Date: 9/7/2011

Date: 9·12·11

# EXHIBIT F

## SIGNAGE, PRELIMINARY PLANS, PRE-OPENING SIGNAGE,
## TRADE DRESS AND EXTERIOR ELEVATION

## EXHIBIT G

## RESTRICTIONS ON USE

[Provisions may be quoted verbatim; if so, references to other exhibits or sections shall
be deemed to incorporate those exhibits/sections of the relevant leases or other
agreements and capitalized terms shall have the respective meanings ascribed in the
lease or other agreement containing the exclusive/use restrictions]

1.    **Chipotle**

Exclusive Use:       The sale of burritos, wraps, fajitas or tacos.

Permitted Use:          A "Chipotle" restaurant serving specialty burritos and
tacos, and other items generally served in a "Chipotle" restaurant including, at Tenant's
option, alcoholic beverages, and in the event of a change in use, for any other lawful
retail purpose not conflicting with any then existing exclusive or prohibited use granted by
Landlord to any other tenant at the Property.

2.    **ATM**

Owner agrees that, during the term of this Lease, no portion of the Tract, other
than that portion leased to Bank herein, shall be used for the installation or operation of
any ATM or any other electronic banking delivery system, except for any such ATM's or
electronic banking systems which may already be in place, and except for any ATM's
which may be located in the interior of any building or store located on the Tract, so long
as there is no advertisement for such ATMs on the exterior of such buildings or stores.

## EXHIBIT H

## SALES TAX REPORT

### AUTHORIZATION TO RELEASE SALES TAX INFORMATION

The undersigned Taxpayer hereby authorizes the Illinois Department of Revenue ("IDOR") to disclose to the designated city, town, village or county the amount of the local government's share of sales tax received on behalf of the taxpayer.  Reporting for a period beginning with tax collected by the department during _____, _____ and
                                                (Beginning Month/Year)

ending with tax collected by the department in _____, _____.
                                             (Ending Month/Year)

This information is to be released to the village, city, town or county of _____, attn: Clerk, Treasurer, Finance Officer, Comptroller, etc.

BUSINESS INFORMATION:

_____
(Illinois Business Tax Number)

_____
(Taxpayer/Business Name)

_____
(Address)

_____
(City, Town, Village or County)

TAXPAYER: The undersigned is an owner/authorized officer of this business.

By:_____
(Signature)

_____
(Print Name)

_____
(Title)

_____
(Telephone Number)

Note:  All requests must have a beginning and ending date. Incomplete request will be returned to the local government.

Normal Main, LLC & Meat Heads Lease

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (this "*First Amendment*") is entered into as of *Feb 1*_____, 2019 (the "*Effective Date*"), by and between C150-II 709 S Main LLC, a Delaware limited liability company ("*Landlord*"), and Meathead Normal, LLC, an Illinois limited liability company ("*Tenant*"). Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Lease (defined below).

## RECITALS

A.    Landlord and Tenant are parties to that certain Lease Agreement dated October 29, 2010 (as amended by this First Amendment, the "*Lease*"), between Landlord's predecessor-in-interest Normal Main LLC and Tenant, pursuant to which Tenant leases from Landlord approximately 2,635 square feet of space on the first floor of the building located at 701 South Main Street, Normal, Illinois (the "*Premises*").

B.    Landlord and Tenant desire to amend the Lease in certain respects, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Landlord and Tenant hereby agree, and the Lease is amended, as follows:

## AGREEMENT

1.    **Rent Reduction**.  Base Rent shall be conditionally reduced during the period beginning on January 1, 2019 and ending on December 31, 2019 (the "*Rent Reduction Period*") from $7,195.83 per month to $6,666.67 per month.  Notwithstanding such reduction of Base Rent, all other sums due under the Lease shall be payable as provided in the Lease.  If a Tenant Default occurs under the Lease at any time, then notwithstanding anything in this First Amendment to the contrary, (i) if the Rent Reduction Period has not expired, the Rent Reduction Period shall immediately terminate and Tenant shall immediately commence payment of the full Base Rent provided for under the Lease without reduction, and (ii) for loss of bargain and not as a penalty, Tenant shall pay to Landlord, in addition to all other amounts due to Landlord under the Lease, an amount equal to the Base Rent that would have been paid under the Lease during the Rent Reduction Period had the Base Rent not been reduced as provided for in this Section 1, and the actual amount of Base Rent paid by Tenant during the Rent Reduction Period.

2.    **Pass-Through Rent**. The obligations of Tenant to pay any accrued Pass-Through Rent and any future Pass-Through Rent under the Lease are deleted from the Lease in for the Rent Reduction Period.  Landlord hereby waives any and all claims under the Lease for Tenant to pay Pass-Through Rent, and fully releases Tenant from its obligations under the Lease to pay the same.

3.    **Percentage Rent**.

(a)    Percentage Rent.  In addition to Base Rent and all other sums due under the Lease, Tenant shall pay to Landlord, for each calendar month during the Term beginning January 2019, percentage rent ("*Percentage Rent*") determined by multiplying the total Gross Sales (as defined

US 6078025v.2

herein) in excess of $66,666.67 for the particular calendar month by ten percent (10%). Percentage Rent shall be paid in monthly installments as herein provided.

(b)     Gross Sales.  As used herein, the term "**Gross Sales**" shall include the entire amount of the sales price, whether for cash or otherwise, of all sales by Tenant and any subtenants, licensees, or concessionaires of food, beverages, gross receipts from all vending machines, merchandise and services, and all other receipts of business conducted in or from the Premises, whether such amount shall be for cash or on credit, paid or unpaid, collected or uncollected, and further including, without limitation, mail or telephone orders received or filled at the Premises and sales of gift or merchandise cards or certificates redeemed at the Premises. Each installment sale shall be treated as a sale for the full price in the month during which such sale was made. The following items shall be excluded from the definition of Gross Sales, or if included in the calculation of Gross Sales, there shall be deducted, as the case may be: (i) the gratuitous food or beverages used for employees for reasonable business purposes (not to exceed, in the aggregate for the period for which Percentage Rent is determined, two percent (2%) of Gross Sales for such period); (ii) employee tips; (iii) any sums collected and paid out for any sales or direct excise tax imposed by any duly constituted governmental authority; (iv) the exchange of inventory between the restaurants of Tenant where such exchanges are made for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, on, in or from the Premises; (v) proceeds from the sale of promotional items sold by Tenant to promote Tenant's business at the Premises to the extent such items are sold at "cost" (i.e., without mark-up, overhead or profit); (vi) the portion of the sale price that is discounted in connection with a promotional coupon the customer gives to Tenant, but only if Tenant has included the full non-discounted price in recording the sale; and (vii) allowances, coupons, discounts, complimentary or promotional food or services donated or sold in accordance with Tenant's normal policies for charitable donations and non-profit community functions (not to exceed, in the aggregate for the period for which Percentage Rent is determined, one percent (1%) of Gross Sales for such period); (viii) sums or credits received in settlement of claims for loss or damages to Tenant's goods.

(c)     Gross Sales Reports and Payment of Percentage Rent.  By the 15th day of each month Tenant shall (i) deliver to Landlord a statement of Gross Sales for the preceding calendar month and for the calendar year to date, certified by Tenant to be accurate, and (ii) pay to Landlord any Percentage Rent due for the preceding calendar month. Within 30 days after the expiration of each calendar year and within 30 days after termination of this Lease, Tenant shall deliver to Landlord (A) a like statement of Gross Sales for the preceding calendar year (or partial calendar year), certified to be correct by an officer of Tenant, and (B) current financial statements for the proceeding calendar year prepared in accordance with generally accepted accounting principles, certified to be correct by an officer of Tenant. Tenant shall furnish similar statements for any licensees, concessionaires and subtenants. All such statements shall be in such form and shall be accompanied by such supporting information as Landlord may reasonably require. If any such statement discloses an error in the calculation of the Percentage Rent for any period, an appropriate adjustment shall be promptly made. If Tenant fails to timely furnish any Gross Sales statement and pay any Percentage Rent that is due in connection with such statement, Landlord may charge a fee of twenty-five dollars ($25.00) per day until the required statement is furnished and any required Percentage Rent is paid. Tenant shall record at the time of sale, in the presence of the customer, all receipts from sales or other transactions in a cash register having a cumulative total which shall be sealed in a manner approved by Landlord, or by using other computerized, point-

of-sale equipment provided that such equipment and the records produced thereby are adequate to enable the proper computation of Gross Sales and Percentage Rent hereunder. Tenant shall keep at the Premises a complete and accurate set of books and records of Gross Sales and all supporting records such as tax reports, banking records, cash register tapes, sales slips and other sales records, which shall be preserved for at least 36 months after the end of the calendar year to which they relate, and if Landlord shall inspect, copy and/or audit Tenant's statements for such calendar year, such books, records and evidence shall continue to be preserved until such inspection and/or audit has been concluded. Landlord and its agents may, at any reasonable time, inspect, copy and/or audit any or all of Tenant's books and accounts, documents, records, sales tax returns, papers and files, which shall in any manner relate to Gross Sales, and at Landlord's request, Tenant shall make all such data available for such examination at such reasonable times as Landlord shall specify. If it is determined by any such audit that any statement previously delivered to Landlord by Tenant was not accurate, an adjustment shall be promptly made, and one party shall pay to the other party upon demand such sums as may be necessary so that the correct amount of Percentage Rent shall have been paid by Tenant to Landlord. If any Gross Sales statements are not submitted by Tenant or if the statements submitted are found to be incorrect to an extent of more than three percent (3%) over the figures submitted by Tenant, Tenant shall pay for Landlord's inspection or audit on demand. Additionally, if such audit reflects that the statements submitted by Tenant are incorrect to an extent of more than ten percent (10%) over the figures submitted by Tenant, then Landlord, in addition to all other remedies, may terminate the Lease upon giving five days' written notice thereof to Tenant.

(d)    Survival. The terms and provisions of this Section 2 shall survive the expiration or earlier termination of the Term.

4.    **Landlord's Notice Address**. Landlord's notice address, as set forth in Section 22 of the Lease, is hereby modified to read in its entirety as follows:

> C150-II 709 S Main LLC
> c/o Campus Advantage, Inc.
> 111 Wild Basin Road, Suite 365
> Austin, Texas 78746
> Attn: Michael Orsak

with copy to:

> C150-II 709 S Main LLC
> c/o Campus Advantage, Inc.
> 709 S. Main Street
> Normal, Illinois 61761
> Attention: Property Manager

5.    **Representations**. Tenant hereby represents and warrants to Landlord that (a) as of the Effective Date, Tenant is the legal and equitable owner of Tenant's entire interest in, to and under the Lease, Tenant has not previously assigned the Lease, and Tenant has the full power and authority to execute and deliver this First Amendment, (b) Tenant in not in default of any of its obligations under the Lease, (c) Tenant has not alleged any default by Landlord that is uncured as of the Effective Date, (d) to the best of Tenant's knowledge, Landlord is not in default under the Lease as of the Effective Date, (e) Tenant has no pending claims, counterclaims, set-offs or

defenses against Landlord arising out of the Lease or relating thereto, and (f) all tenant work allowances provided to Tenant under the Lease, or otherwise, if any, have been paid in full by Landlord and Landlord has no further obligations with respect thereto.

6.  **Ratification**.  As amended hereby, the Lease is ratified and confirmed as being in full force and effect.  Each party agrees that the Lease is the binding and enforceable obligation of such party.  To the extent of any conflict or inconsistency between this First Amendment and the terms of the Lease, the terms of this First Amendment shall govern and control to the extent, but only to the extent, of such conflict or inconsistency.  Nothing in this First Amendment shall be deemed a waiver or release of any unperformed obligations of Landlord and Tenant under the Lease, including, without limitation, any delinquent rentals or other delinquent payments payable by Tenant under the Lease.

7.  **Counterparts**.  This First Amendment may be executed in a number of identical counterparts.  If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one instrument, but, in making proof of this instrument, it shall not be necessary to produce or account for more than one such counterpart.

8.  **Confidentiality**.    Tenant will keep confidential (a) the terms of this First Amendment, and (b) all negotiations and communications with Landlord in connection with this First Amendment (collectively, "***Confidential Information***"), and Tenant will not disclose or make available any Confidential Information to any other tenant in the Building or to any other person or entity, except as required by applicable law or to Tenant's accountants, brokers, attorneys, consultants and other agents for the purpose of providing advice to Tenant in connection with the Confidential Information and who agree to preserve the confidential nature of the Confidential Information.

(Signatures on following page)

US 6078025v.2

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment as of the Effective Date.

**LANDLORD:**

**C150-II 709 S MAIN LLC,** a Delaware limited liability company

By:    Campus 150 Venture II LLC, a Delaware limited liability company, its sole member

     By:    CampusFlo 2 LP, a Delaware limited partnership, its manager

          By:    CampusFlo GP 2 LLC, a Delaware limited liability company, its general partner

               By: _____

               Name: Michael Orsak

               Title:   Authorized Representative


**TENANT:**

**MEATHEADS NORMAL, LLC**, an Illinois Limited liability company

By: _____

Name: Brian Lundstrom

Title: CFO

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT (this "*Second Amendment*") is entered into as of ꓔꓴꓠꓱ 1ⵣ , 2020 (the "*Effective Date*"), by and between C150-II 709 S Main LLC, a Delaware limited liability company ("*Landlord*"), and Meathead Restaurants, LLC, a Delaware limited liability company ("*Tenant*"). Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Lease (defined below).

### RECITALS

A.    Landlord and Tenant are parties to that certain Lease Agreement dated October 29, 2010, as amended by that certain First Amendment to Lease Agreement (the "*First Amendment*") dated as of February 1, 2019 (as further amended by this Second Amendment, the "*Lease*"), between Landlord's predecessor-in-interest, Normal Main, LLC, and Tenant's predecessor-in-interest, Meathead Normal, LLC, pursuant to which Tenant leases from Landlord approximately 2,635 square feet of space on the first floor of the building located at 701 South Main Street, Normal, Illinois (the "*Premises*").

B.    Landlord and Tenant desire to amend the Lease in certain respects, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Landlord and Tenant hereby agree, and the Lease is amended, as follows:

### AGREEMENT

1.    **Rent Reduction**. Base Rent shall be conditionally reduced during the period beginning on April 1, 2020 and ending on March 31, 2021 (the "*Additional Rent Reduction Period*"), as provided below. For the period from April 1, 2020 and ending on August 31, 2020, Base Rent shall be conditionally reduced from $7,195.83 per month to $4,322.60 per month. For the period from September 1, 2020 and ending on March 31, 2021, Base Rent shall be conditionally reduced from $7,195.83 per month to $7,048.30 per month. Further, Pass-Though Rent shall be abated during the Additional Rent Reduction Period. Notwithstanding such reduction of Base Rent and abatement of Pass-Through Rent, all other sums due under the Lease shall be payable as provided in the Lease. If a Tenant Default occurs under the Lease at any time, then notwithstanding anything in this Second Amendment to the contrary, (i) if the Additional Rent Reduction Period has not expired, the Additional Rent Reduction Period shall immediately terminate and Tenant shall immediately commence payment of the full Base Rent and Pass-Through Rent provided for under the Lease without reduction, and (ii) for loss of bargain and not as a penalty, Tenant shall pay to Landlord, in addition to all other amounts due to Landlord under the Lease, an amount equal to the Base Rent and Pass-Through Rent that would have been paid under the Lease during the Additional Rent Reduction Period had the Base Rent not been reduced and the Pass-Through Rent not been abated as provided for in this Section 1, and the actual amount of Base Rent paid by Tenant during the Additional Rent Reduction Period.

2.    **Percentage Rent**. Section 3(a) of the First Amendment is amended and restated in its entirety to provide as follows:

"(a)    Percentage Rent. In addition to Base Rent and all other sums due under the Lease, Tenant shall pay to Landlord, for each calendar month during the Additional Rent Reduction Period, percentage rent ("*Percentage Rent*") determined by multiplying the total Gross Sales (as defined in the First Amendment) in such calendar month in excess of (i) $43,226.00 for each calendar month from April 1, 2020 through August 31, 2020, and (ii) $70,483.00 for each calendar month from September 1, 2020 through March 31, 2021, by ten percent (10%). Percentage Rent shall be paid in monthly installments as provided in the First Amendment."

Landlord and Tenant agree that Sections 3(b), 3(c) and 3(d) of the First Amendment remain in full force and effect, provided, however, that Tenant agrees to provide the monthly reporting required in Section 3(c) of the First Amendment on or before the 10th day (rather than the 15th day) of each calendar month.

3.      **Extension of Initial Term of the Lease**. The Initial Term of the Lease is extended for six (6) additional calendar months from September 1, 2021 through February 28, 2022 (the "*Extended Initial Term*"). For the Extended Initial Term, Tenant shall pay (i) Base Rent in the amount of $7,195.83 per month, and (ii) Pass-Through Rent, currently estimated to be $727.28 per month.

4.      **Pass-Through Rent**. Notwithstanding anything to the contrary set forth in the First Amendment, except as expressly provided otherwise in Section 1 of this Second Amendment, Tenant shall pay Pass-Through Rent under the Lease for all periods during the Term (including any Extension Terms) other than for the Rent Reduction Period (defined in the First Amendment) and the Additional Rent Reduction Period. Section 2 of the First Amendment does not apply to the obligations set forth in this paragraph.

5.      **Representations**. Tenant hereby represents and warrants to Landlord that (a) as of the Effective Date, Tenant is the legal and equitable owner of Tenant's entire interest in, to and under the Lease, Tenant has not previously assigned the Lease, and Tenant has the full power and authority to execute and deliver this Second Amendment, (b) Tenant in not in default of any of its obligations under the Lease, (c) Tenant has not alleged any default by Landlord that is uncured as of the Effective Date, (d) to the best of Tenant's knowledge, Landlord is not in default under the Lease as of the Effective Date, (e) Tenant has no pending claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or relating thereto, and (f) all tenant work allowances provided to Tenant under the Lease, or otherwise, if any, have been paid in full by Landlord and Landlord has no further obligations with respect thereto.

6.      **Ratification**. As amended hereby, the Lease is ratified and confirmed as being in full force and effect. Each party agrees that the Lease is the binding and enforceable obligation of such party. To the extent of any conflict or inconsistency between this Second Amendment and the terms of the Lease, the terms of this Second Amendment shall govern and control to the extent, but only to the extent, of such conflict or inconsistency. Nothing in this Second Amendment shall be deemed a waiver or release of any unperformed obligations of Landlord and Tenant under the Lease, including, without limitation, any delinquent rentals or other delinquent payments payable by Tenant under the Lease.



7.  **Counterparts**. This Second Amendment may be executed in a number of identical counterparts. If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one instrument, but, in making proof of this instrument, it shall not be necessary to produce or account for more than one such counterpart.

8.  **Confidentiality**.  Tenant will keep confidential (a) the terms of this Second Amendment, and (b) all negotiations and communications with Landlord in connection with this Second Amendment (collectively, "*Confidential Information*"), and Tenant will not disclose or make available any Confidential Information to any other tenant in the Building or to any other person or entity, except as required by applicable law or to Tenant's accountants, brokers, attorneys, consultants and other agents for the purpose of providing advice to Tenant in connection with the Confidential Information and who agree to preserve the confidential nature of the Confidential Information.

9.  **Tenant's Notice Address**. Tenant's notice address as set forth in Section 22 of the Lease, is hereby modified to read as follows:

Meathead Restaurants, LLC
444 W Lake Street, 17th Floor
Chicago, Illinois 60606
Attn: Michael A. Webb

(Signatures on following page)



IN WITNESS WHEREOF, Landlord and Tenant have executed this Second Amendment as of the Effective Date.

**LANDLORD:**

**C150-II 709 S MAIN LLC,** a Delaware limited liability company

By:      Campus 150 Venture II LLC, a Delaware limited liability company, its sole member

     By:   CampusFlo 2 LP, a Delaware limited partnership, its manager

          By:   CampusFlo GP 2 LLC, a Delaware limited liability company, its general partner

              By: _____

              Name: Michael Orsak

              Title: Authorized Representative

**TENANT:**

**MEATHEAD RESTAURANTS, LLC,** a Delaware Limited liability company

By: _____

Name: _Michael A. Webb_

Title: _MANAGING PARTNER_

**The Flats**
706 S Main Street
Normal, IL 61761

Statement Date:                6/25/2021

## STATEMENT OF ACCOUNT
### Meatheads

| DATE | DESCRIPTION | CHARGES | CREDITS | ACCOUNT BALANCE | |
|------|-------------|---------|---------|-----------------|---|
| | *Balance brought forward* | | | 0.00 | |
| 2/1/2021 | Rent (02/2021) | 7,195.83 | | 7,195.83 | |
| 3/1/2021 | Partial Payment (02/2021) | | 4,100.29 | 3,095.54 | |
| 3/1/2021 | Rent (03/2021) | 7,195.83 | | 10,291.37 | |
| 3/1/2021 | Rent Abatement (03/2021) | (147.53) | | 10,143.84 | |
| 4/1/2021 | Rent (04/2021) | 7,195.83 | | 17,339.67 | |
| 4/1/2021 | CAM (04/2021) | 1,145.60 | | 18,485.27 | |
| 4/1/2021 | Insurance (04/2021) | 138.77 | | 18,624.04 | |
| 4/1/2021 | Property Tax (04/2021) | 56.08 | | 18,680.12 | ** |

** - Balance thru the petition date of 4/28/2021